[L.A. No. 32052. Oct. 17, 1985.]

DENNIS KOIRE, Plaintiff and Appellant, v.
METRO CAR WASH et al., Defendants and Respondents.

26

**COUNSEL**

Wallin, Roseman & Talmo, Wallin, Roseman, Talmo & Klarich and Ronald R. Talmo for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, and Marian M. Johnston, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Appellant.

William A. Woodyard and William A. Elliott for Defendants and Respondents.

## OPINION

BIRD, C. J.— ██ Does the Unruh Civil Rights Act (Civ. Code, § 51)[1] prohibit sex-based price discounts?

### I.

In the spring of 1979, plaintiff sought to have his car washed at several car washes located in Orange County. He visited the car washes on "Ladies' Day" and asked to be charged the same discount prices as were offered to females.[2] These businesses refused his request.[3]

Plaintiff also visited several bars which offered admission discounts to women, including a nightclub, Jezebel's. At trial, plaintiff testified that he heard a radio advertisement for Jezebel's. The ad publicized an event scheduled for the following weekend to celebrate the first opportunity for young adults aged 18 to 21 to patronize the establishment. The ad stated that all "girls" aged 18 to 21 would be admitted free. Plaintiff, 18 years old at the time, went to Jezebel's and requested free admission which was refused.

Jezebel's owner and manager testified that there had been no such advertisement and promotional discount as described by plaintiff. However, the nightclub does have a regular "Ladies' Night." Women are admitted free but men must pay a $2 cover charge.

Plaintiff filed suit against numerous car washes and bars, claiming that their sex-based price discounts violated the Unruh Civil Rights Act (hereafter the Unruh Act or the Act.)[4] He sought statutory damages and an in-

---

[1] Section 51 provides: "This section shall be known, and may be cited, as the Unruh Civil Rights Act. [¶] All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. [¶] This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry, or national origin."
All subsequent statutory references are to the Civil Code unless otherwise indicated.

[2] The discounts offered to women on "Ladies' Day" ranged from 4 percent (men paid $3.75 and women paid $3.60) to 38 percent (men paid $4.79 and women paid $2.99).

[3] There was conflicting testimony at trial about whether defendant State College Car Wash refused to wash plaintiff's car for the reduced "Ladies' Day" price. The trial court did not resolve the factual dispute, since it held as a matter of law that "Ladies' Day" discounts do not violate the Unruh Civil Rights Act. State College Car Wash does not deny that it advertises special "Ladies' Day" prices. At a minimum, men who wish to be charged the same price as women on "Ladies' Day" must affirmatively assert their right to equal treatment.

[4] Plaintiff also alleged that defendants' policies constituted an unfair business practice in violation of Business and Professions Code section 17500.

junction.[5] He eventually went to trial against seven car washes and Jezebel's.

The trial court granted judgment for defendants on all causes of action. The court found that the sex-based price discounts did not violate the Unruh Act. Plaintiff appeals.[6]

## II.

The language of the Unruh Act is clear and unambiguous: "All persons within the jurisdiction of this state are free and equal, and *no matter what their sex . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments* of every kind whatsoever. . . ." ■ The Act is to be given a liberal construction with a view to effectuating its purposes. (*Orloff* v. *Los Angeles Turf Club* (1947) 30 Cal.2d 110, 113 [180 P.2d 321, 171 A.L.R. 913]; *Winchell* v. *English* (1976) 62 Cal.App.3d 125, 128 [133 Cal.Rptr. 20].)

■ The parties do not dispute that defendants are business establishments to which the Unruh Act applies. (See generally, *In re Cox* (1970) 3 Cal.3d 205, 212-213 [9 Cal.Rptr. 24, 474 P.2d 992]; 34 Ops.Cal.Atty.Gen. 230, 231-232 (1959).) Nor can there be any dispute that the Act applies to classifications based on sex. Although the list of classes enumerated in the Act has been held to be illustrative rather than exhaustive (*Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 725 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161] [hereafter *Marina Point*]; *In re Cox, supra*, 3 Cal.3d at p. 216; *Rolon* v. *Kulwitzky* (1984) 153 Cal.App.3d 289, 292 [200 Cal.Rptr. 217]; *Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 733 [195 Cal.Rptr. 325, 38 A.L.R.4th 607]), the inclusion of "sex" in the list clearly covers discrimination based on sex. (See, e.g., *Easebe Enterprises, Inc.* v. *Alcoholic Bev. etc. Appeals Bd.* (1983) 141 Cal.App.3d 981, 986 & fn. 4 [190 Cal.Rptr. 678, 38 A.L.R.4th 332]; *Hales* v. *Ojai Valley Inn & Country Club* (1977) 73 Cal.App.3d 25, 28-29 [140 Cal.Rptr. 555, 89 A.L.R.3d 1].)

---

[5]Section 52 provides in pertinent part: "(a) Whoever . . . makes any discrimination, distinction or restriction on account of sex . . . contrary to the provisions of section 51 . . ., is liable for each and every such offense for the actual damages, and such amount as may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage, but in no case less than two hundred and fifty dollars ($250) . . . ." In addition, "[a]lthough the Unruh Act makes no express provision for injunctive relief, that remedy as well as damages may be available to an aggrieved person." (*Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 470 [20 Cal.Rptr. 609, 370 P.2d 313].)

[6]Plaintiff did not appeal the judgment on the cause of action alleging a violation of Business and Professions Code section 17500.

Defendants argue that the Unruh Act prohibits only the *exclusion* of a member of a protected class from a business establishment. They claim the law allows discrimination based on admission prices and services. Defendants also argue that the Unruh Act prohibits only *arbitrary* discrimination, and that the sex-based price discounts at issue here fall within recognized exceptions to the Act. In addition, defendants argue that the sex-based discounts did not violate the Act because they did not injure plaintiff. Finally, they contend that a prohibition on sex-based discounts will mean an end to all promotional discounts.

Defendant's first contention, that the Act prohibits only the *exclusion* of prospective patrons from business establishments, is without merit. The Act guarantees *"full and equal accommodations, advantages, facilities, privileges, or services . . . ."* (§ 51.) The scope of the statute clearly is not limited to exclusionary practices. The Legislature's choice of terms evidences concern not only with access to business establishments, but with equal treatment of patrons in all aspects of the business.

Courts have repeatedly held that the Unruh Act is applicable where unequal treatment is the result of a business practice. Several early cases found violations of this Act and its predecessor when blacks were allowed to enter business establishments but were restricted to certain portions of the premises. (See, e.g., *Jones* v. *Kehrlein* (1920) 49 Cal.App. 646, 651 [194 P. 55] [black ticketholders admitted to theatre but restricted to seating in segregated section]; *Suttles* v. *Hollywood Turf Club* (1941) 45 Cal.App.2d 283, 287 [114 P.2d 27] [black ticketholders admitted to racetrack but denied clubhouse seating].) In *People* v. *McKale* (1979) 25 Cal.3d 626 [159 Cal.Rptr. 811, 602 P.2d 731], the plaintiff alleged "a pattern of discriminative conduct" by defendant mobilehome park against applicants and tenants, "varying from instances of abusive language . . . to discriminative sales and leasing policies." This court concluded that such discrimination was "clearly unlawful" under the Unruh Act and held that plaintiff had adequately stated a cause of action. (*Id.*, at p. 637.)

In *Hutson* v. *The Owl Drug Co.* (1926) 79 Cal.App. 390 [249 P. 524], a black plaintiff was allowed to sit at a soda fountain, but the employee "placed [her order] amongst dirty dishes on the counter." (*Id.*, at p. 392.) Another employee then struck the plaintiff and threw a cup of coffee on her. (*Ibid.*) The court held that the plaintiff "was not accorded the same accommodations, advantages, facilities and privileges" due persons of all races. (*Id.*, at p. 393.)

In 59 Ops.Cal.Atty.Gen. 70 (1976), the Attorney General opined that differential treatment of students by fast food outlets and convenience

stores violated the Unruh Act. The opinion disapproved of a variety of discriminatory practices, including limiting the number of student patrons, restricting students to certain hours or portions of the premises, or levying a minimum charge on student purchases. (*Id.*, at p. 70.) "Any business restrictions of the type enumerated . . . would appear to be arbitrary and unlawful." (*Ibid.*) ■ While opinions of the Attorney General are not controlling authority, they are entitled to consideration. (*Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 751-752 [100 Cal.Rptr. 290, 493 P.2d 1154]; *Sonoma County Bd. of Education* v. *Public Employment Relations Bd.* (1980) 102 Cal.App.3d 689, 699 [163 Cal.Rptr. 464].) ■ In this instance, the Attorney General's interpretation of the Act is correct.

■ Contrary to defendants' assertions, the scope of the Unruh Act is not narrowly limited to practices which totally exclude classes or individuals from business establishments. The Act's proscription is broad enough to include within its scope discrimination in the form of sex-based price discounts.

Defendants' primary argument is that sex-based price discounts do not constitute "arbitrary" discrimination. ■ Although the Unruh Act proscribes "any form of arbitrary discrimination" (*O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790, 794 [191 Cal.Rptr. 320, 662 P.2d 427]), certain types of discrimination have been denominated "reasonable" and, therefore, not arbitrary. For example, the Act does not prevent a business enterprise from promulgating " " "reasonable deportment regulations." " " (*Ibid.*; *Marina Point, supra,* 30 Cal.3d at pp. 725, 738-739; *Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734, 741 [227 P.2d 449].) " ' "[A]n entrepreneur need not tolerate customers who damage property, injure others or otherwise disrupt his business." ' " (*O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d at p. 794; *Marina Point, supra,* 30 Cal.3d at p. 737; *In re Cox, supra,* 3 Cal.3d at p. 217.)

In certain contexts, it has been said that the Act is inapplicable to discrimination between patrons based on the "nature of the business enterprise and of the facilities provided." (*O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d at p. 794; see *Marina Point, supra,* 30 Cal.3d at p. 741; *Wynn* v. *Monterey Club* (1980) 111 Cal.App.3d 789, 796-798 [168 Cal.Rptr. 878].) However, few cases have held discriminatory treatment to be nonarbitrary based solely on the special nature of the business establishment.

One such case is *Wynn* v. *Monterey Club, supra,* 111 Cal.App.3d 789. In *Wynn,* the Court of Appeal held that excluding an *individual* woman from a gambling club did not violate the Unruh Act when she was "a compulsive

gambler who had manifested a propensity to gamble beyond her means to the extent of committing what was possibly an illegal act, all of which was having a detrimental effect on her own well-being as well as that of her husband, and these factors were all known to the defendants." (*Id.*, at p. 797.) The court observed that defendants' business was a "gambling establishment[] and not some form of harmless entertainment." (*Id.*, at p. 798.)

In *Ross* v. *Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988 [203 Cal.Rptr. 468], the Court of Appeal held that it was not a violation of the Unruh Act for a cemetery to exclude "punk rockers" from a private funeral at the request of the mother of the deceased. "Given the sensitive nature of the services offered by the cemetery, a policy permitting private funerals by which those who are not invited may not attend is a reasonable regulation 'rationally related to the services performed.'" (*Id.*, at p. 993.)[7]

Most often, the nature of the business enterprise or the facilities provided has been asserted as a basis for upholding a discriminatory practice *only* when there is a strong public policy in favor of such treatment. (See *Marina Point, supra,* 30 Cal.3d at pp. 742-743.) Public policy may be gleaned by reviewing other statutory enactments. For example, it is permissible to exclude children from bars or adult bookstores because it is illegal to serve alcoholic beverages or to distribute "'harmful matter'" to minors. (*Id.*, at p. 741, citing Bus. & Prof. Code, § 25658 and Pen. Code, § 313.1.) This sort of discrimination is not arbitrary because it is based on a "compelling societal interest" (*Marina Point, supra,* 30 Cal.3d at p. 743) and does not violate the Act.[8]

---

[7]It should be noted that this "nature of the business" exception to the Act had its origin in *In re Cox, supra,* 3 Cal.3d 205. This court concluded that a business establishment may "promulgate reasonable *deportment* regulations that are rationally related to the services performed and the facilities provided." (*Id.*, at p. 217, italics added.) That pronouncement did nothing more than acknowledge that certain behavior may be appropriate in one setting but inappropriate in another. For example, loudly voicing one's excitement, exultation or disappointment may be acceptable and appropriate behavior at a racetrack, but it may be entirely inappropriate in an otherwise tranquil restaurant.

Since the "exception" at issue was originally but one aspect of the exception for reasonable deportment regulations, its application to other situations should be carefully and narrowly construed.

[8]"Public policy" exceptions to the Unruh Act are rare. In *Pines* v. *Tomson* (1984) 160 Cal.App.3d 370 [206 Cal.Rptr. 866], the defendants owned and operated the "Christian Yellow Pages," which accepted only advertisements placed by persons who affirmed orally and in writing that they had accepted Jesus Christ as their personal savior and were "born-again" Christians. (*Id.*, at p. 375.) The defendants argued that they were entitled to a "public policy" exception to the Unruh Act. The Court of Appeal rejected this argument, noting that when this court had discussed such an exception in *Marina Point,* the public policy at issue had a statutory basis. (*Pines* v. *Tomson, supra,* at p. 387.) Characterizing the defendant's contention as a First Amendment "constitutional argument in disguise," (*ibid.*) the

■ Defendants argue that sex-based price differences are not arbitrary because they are supported by "substantial business and social purposes."[9] Essentially, they argue that the discounts are permissible because they are profitable.

In *Marina Point*, this court held that the fact that a business enterprise was " 'proceed[ing] from a motive of rational self-interest' " did *not* justify discrimination. (*Marina Point, supra,* 30 Cal.3d at p. 740, fn. 9, disapproving *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 302 [131 Cal.Rptr. 547].) This court noted that "an entrepreneur may pursue many discriminatory practices 'from a motive of rational self-interest,' e.g., economic gain, which would unquestionably violate the Unruh Act. For example, an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a 'rational' economic motive would not, of course, validate the practice." (*Marina Point, supra,* 30 Cal.3d at p. 740, fn. 9.) It would be no less a violation of the Act for an entrepreneur to charge all homosexuals, or all nonhomosexuals, reduced rates in his or her restaurant or hotel in order to encourage one group's patronage and, thereby, increase profits. The same reasoning is applicable here, where reduced rates were offered to women and not men.[10]

---

Court of Appeal held that the Act "require[d] [defendants] to act in a nondiscriminatory manner toward all prospective advertisers" (*id.,* at p. 389, italics omitted) and that their practices violated the Unruh Act. The court noted the government's " 'compelling interest in eradicating discrimination in all forms,' " including discrimination based on religious creed. (*Id.,* at p. 391.)

[9]Defendants do not contend that their sex-based admission discounts constitute reasonable deportment regulations. The prices charged are in no way dependent on the individual characteristics or conduct of the customers. They are based solely on the customer's sex.

[10]Defendants rely principally on *Archibald* v. *Cinerama Hawaiian Hotels, Inc.* (1977) 73 Cal.App.3d 152 [140 Cal.Rptr. 599], for the proposition that price discounts are permissible. In *Archibald,* the plaintiff sued a number of Hawaiian hotels which gave special discount rates to Hawaiian residents. She alleged several causes of action, including a violation of the Unruh Act. The Court of Appeal held that the plaintiff had failed to state a cause of action since the Unruh Act applies only in California. (*Id.,* at p. 159.) The court added that even if the Act were to be applied, it did not proscribe the practices about which plaintiff complained. (*Ibid.*) The latter statement, made in a conclusory manner and without the benefit of analysis, was merely dictum. It is of no value to defendants in this action. To the extent that it is inconsistent with the views expressed herein, it is disapproved.

The Court of Appeal also held that the plaintiff failed to state a cause of action for breach of the *common law* duties of an innkeeper not to discriminate. (*Archibald, supra,* 73 Cal.App.3d at pp. 156-158.) The court stated broadly that it found "no authority holding that the offering of a discount to certain clients, patrons or customers based on an attempt to attract their business is unlawful under the common law." (*Id.,* at p. 157.) Defendants attempt to adopt the court's analysis of that cause of action in the context of an alleged Unruh Act violation. Carried to its logical conclusion, defendants' argument would permit hotels and other business establishments to charge discriminatory rates based on a customer's race, religion, or other arbitrary criterion. Whatever the parameters of the common law proscriptions against discrimination in public accommodations, the Unruh Act provides a clear statement of *legislative* intent to prohibit exactly this sort of discriminatory treatment.

Defendant Jezebel's argues that "Ladies' Night" encourages more women to attend the bar, thereby promoting more interaction between the sexes. This it deems to be a "socially desirable goal" of the state. However, the "social" policy on which Jezebel's relies—encouraging men and women to socialize in a bar—is a far cry from the social policies which have justified other exceptions to the Unruh Act. For example, the compelling societal interest in ensuring adequate housing for the elderly which justifies differential treatment based on age cannot be compared to the goal of attracting young women to a bar. (*Marina Point, supra,* 30 Cal.3d at pp. 742-743; see *post,* at pp. 36-38.) The need to promote the "social policy" asserted by Jezebel's is not sufficiently compelling to warrant an exception to the Unruh Act's prohibition on sex discrimination by business establishments.[11]

Next, defendants argue that their sex-based price discounts do not violate the Unruh Act because "Ladies' Day" discounts do no injury to either men or women.[12] They contend that this plaintiff was not injured by the price differences.[13] Defendants' argument fails for several reasons.

First, it does not recognize that by passing the Unruh Act, the Legislature established that arbitrary sex discrimination by businesses is *per se* injurious. Section 51 provides that all patrons are entitled to *equal* treatment. Section 52 provides for minimum statutory damages of $250 for *every* violation of section 51, *regardless* of the plaintiff's actual damages.[14]

As this court noted in *Orloff* v. *Los Angeles Turf Club, supra,* 30 Cal.2d at page 115, construing an earlier version of the statute, the statute provides for damages aside from any actual damages incurred by the plaintiff. " 'This sum is unquestionably a penalty which the law imposes, and which it directs shall be paid to the complaining party. . . . [But], while the law has seen

---

[11]The other defendants do not offer to explain how "Ladies' Day" at the car washes promotes any important social policy.

[12]The trial court found "no intent to arbitrarily exclude men on 'Ladies Day,' " and that "Ladies Day" is "not calculated to make men feel unwelcome, unaccepted or undesired." However, discriminatory *intent* is not required by the Unruh Act. The Act states simply that "*[a]ll persons . . . are entitled* to [] full and equal . . . advantages [or] privileges . . . ." Plaintiff was entitled to equal treatment, "no matter what [his] sex," regardless of defendants' intent in denying him equal treatment.

Some bars may offer price discounts to women in order to *discourage* male patronage (see *Harari Restaurant Corp.* v. *McLaughlin* (1981) 81 App.Div.2d 512 [437 N.Y.S.2d 349, 350], affd. in pert. part 55 N.Y.2d 730 [447 N.Y.S.2d 153, 43 N.E.2d 638]), while others, such as Jezebel's, do so in order to *encourage* the patronage of men. The legality of the practice cannot be dependent on the nature, indeed the *sex,* of the clientele an establishment wishes to attract.

[13]Jezebel's claims it "has not harmed a single hair on the plaintiff's head or subjected him to the slightest deprivation or embarrassment of any kind."

[14]See, *ante,* footnote 5 for the text of section 52.

fit to declare that it shall be paid to the complaining party, it might as well have directed that it be paid into the common-school fund. The imposition is in its nature penal, *having regard only to the fact that the law has been violated and its majesty outraged.'*" (Italics added.) (Accord *MacLean* v. *First North. Industries of America* (1981) 96 Wn.2d 338 [635 P.2d 683, 690] (dis. opn. of Utter, J.) [arguing that the state of Washington's antidiscrimination laws recognize that discrimination "injures not only the victim but the state and public in general," and can therefore be attacked "despite an injury-free victim"].)

Second, defendants ignore both the individual nature of a cause of action under the Unruh Act (see *Marina Point, supra,* 30 Cal.3d at pp. 725, 738) and the actual injury to this plaintiff. The plaintiff *was* adversely affected by the price discounts. His female peers were admitted to the bar free, while he had to pay. On the days he visited the car washes, he had to pay more than any woman customer, based solely on his sex. In addition to the economic impact, the price differentials made him feel that he was being treated unfairly.[15]

Moreover, differential pricing based on sex may be generally detrimental to both men and women, because it reinforces harmful stereotypes. (See Babcock et al., Sex Discrimination and the Law (1975) p. 1069; Note, *Washington's Equal Rights Amendment and Law Against Discrimination— The Approval of the Seattle Sonics' "Ladies' Night"* (1983) 58 Wash. L.Rev. 465, 473.)

Men and women alike suffer from the stereotypes perpetrated by sex-based differential treatment. (See Kanowitz, *"Benign" Sex Discrimination: Its Troubles and Their Cure* (1980) 31 Hastings L.J. 1379, 1394; Comment, *Equal Rights Provisions: The Experience Under State Constitutions* (1977) 65 Cal.L.Rev. 1086, 1106-1107.) When the law "emphasizes irrelevant differences between men and women[,] [it] cannot help influencing the content and the tone of the social, as well as the legal, relations between the sexes. . . . As long as organized legal systems, at once the most respected

---

[15]Plaintiff testified at trial that he remembered the radio advertisement for Jezebel's clearly:

"I can recall that, because I thought that that was so unbelievable that I can recall that like it was yesterday—like it was today. That is how unbelievable that was to me. Letting minors in the club and then just letting the girls in free, that is unbelievable. A Celebration there. The guy was all happy. Come on down. We're letting in these people 18 to 21. You know, all the girls from 18 to 21 get in free. It just smoked me."

Plaintiff also testified that he encountered hostility and ridicule when he requested car washes at the "Ladies' Day" prices. On one occasion, the cashier responded to his request, "[n]o, I don't see you wearing a skirt." On another occasion, at a different car wash, the cashier "screamed" at him, "[n]o, are you a lady?"

and most feared of social institutions, continue to differentiate sharply, in treatment or in words, between men and women on the basis of irrelevant and artificially created distinctions, the likelihood of men and women coming to regard one another primarily as fellow human beings and only secondarily as representatives of another sex will continue to be remote. When men and women are prevented from recognizing one another's essential humanity by sexual prejudices, nourished by legal as well as social institutions, society as a whole remains less than it could otherwise become." (Kanowitz, Women and the Law (1969) p. 4.)

Whether or not these defendants consciously based their discounts on sex stereotypes, the practice has traditionally been of that character. For example, in *Com., Pa. Liquor Control Bd.* v. *Dobrinoff* (1984) 80 Pa.Cmwlth. 453 [471 A.2d 941], the trial court relied on just such a stereotype in upholding a tavern's cover charge distinction based on sex. The court suggested that the purpose of the discount was " 'chivalry and courtesy to the fair sex.' " (*Id.,* at p. 943.) The appellate court held, however, that a variance in admission charge based "solely upon a difference in gender, having no legitimate relevance in the circumstances" violated the Pennsylvania Human Relation Act's prohibition against sex discrimination. (*Ibid.*)

Similarly, in striking down the New York Yankees "Ladies' Day" promotion, the New York State Human Rights Appeal Board observed that "the stereotyped characterizations of a woman's role in society that prevailed at the inception of 'Ladies' Day' in 1876" were outdated and no longer valid "in a modern technological society where women and men are to be on equal footing as a matter of public policy." (*Abosh* v. *New York Yankees, Inc.* (1972) No. CPS-25284, Appeal No. 1194, reprinted in Babcock et al., Sex Discrimination and the Law, *supra,* at pp. 1069, 1070.)

With all due respect, the Washington Supreme Court also succumbed to sexual stereotyping in upholding the Seattle Supersonics' "Ladies' Night." (*MacLean* v. *First North. Industries of America, supra,* 635 P.2d at p. 684.) The court found that the discount was reasonable because, inter alia, "women do not manifest the same interest in basketball that men do." (*Ibid.*)[16]

This sort of class-based generalization as a justification for differential treatment is precisely the type of practice prohibited by the Unruh Act. (See

---

[16]The court also noted other "attraction[s]" offered by the Sonics especially for women, including "performances by the Seattle Symphony before the game and at half time, women's fashion shows at half time, gifts and souvenirs, and women's hoop shooting at half time." (*MacLean, supra,* 635 P.2d at p. 685.)

*O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d at p. 794; *Marina Point, supra,* 30 Cal.3d at pp. 739-740.) "[T]he Unruh Civil Rights Act prohibits all forms of stereotypical discrimination." (*San Jose Country Club Apartments* v. *County of Santa Clara* (1982) 137 Cal.App.3d 948, 952 [187 Cal.Rptr. 493].) These sex-based discounts impermissibly perpetuate sexual stereotypes.

Defendants protest that an end to "Ladies' Day" will mean an end to all types of promotional discounts. They contend that this will be detrimental to businesses, and that the Legislature never intended such a result.

A multitude of promotional discounts come to mind which are clearly permissible under the Unruh Act. For example, a business establishment might offer reduced rates to *all* customers on one day each week. Or, a business might offer a discount to any customer who meets a condition which any patron could satisfy (e.g., presenting a coupon, or sporting a certain color shirt or a particular bumper sticker). In addition, nothing prevents a business from offering discounts for purchasing commodities in quantity, or for making advance reservations.[17] The key is that the discounts must be "applicable alike to persons of every sex, color, race, [etc.]" (§ 51), instead of being contingent on some arbitrary, class-based generalization.

Defendants want their discriminatory acts to be analogized to age-based price discounts. Charging different prices to children and senior citizens is sometimes permissible and socially desirable. However, the fact that sex-based price discounts are not permissible does not have an impact on the validity of age-based discounts.

■ Public policy in California strongly supports eradication of discrimination based on sex. The Unruh Act expressly prohibits sex discrimination by business enterprises. (§ 51.) The California Fair Employment and Housing Act prohibits sex discrimination in employment. (Gov. Code, § 12900 et seq.) Numerous other statutes stand as evidence of this strong public policy. (See, e.g., Lab. Code, § 1197.5 [Equal Pay Act]; Ed. Code, § 89757 [prohibiting use of public funds by university or college for membership or participation in private organizations with discriminatory membership practices].)

---

[17]The Legislature has explicitly provided for certain price discounts. (See, e.g., Pub. Util. Code, § 523 [persons who may be given free or reduced rates on common carriers]; Food & Agr. Code, §§ 3021, 3022 [persons who may be admitted free to state, district and county fairs].)

■ In addition, classifications based on sex are considered "suspect" for purposes of equal protection analysis under the California Constitution. (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].) California ratified the proposed Equal Rights Amendment to the United States Constitution on November 17, 1972, within one year of its passage by Congress. (Sen. Joint Res. No. 20, Stats. 1972 (Reg. Sess.) res. ch. 148, p. 3440.) ■ In short, public policy in California mandates the *equal* treatment of men and women.

The public policy considerations applicable to price discounts for children or senior citizens are very different from those applicable to sex-based discounts. Although this court need not determine the validity of any specific age-based discount, especially without the benefit of briefing on the issue from parties actually affected by the practice, several important and distinguishing features should be noted.

Numerous statutes in California provide for differential treatment of children and adults. (See, e.g., Welf. & Inst. Code, § 200 et seq. [the Arnold-Kennick Juvenile Court Law]; Civ. Code, § 1556 [limitation on minors' capacity to contract]; Veh. Code, § 12507 [no person under 16 years of age may be licensed to drive].)

Similarly, state and federal legislation has been enacted to address the special needs of our elderly citizens. (See, e.g., 42 U.S.C. § 1381 et seq. [supplemental security income]; Welf. & Inst. Code, § 12050 et seq. [eligibility for old age security benefits]. In *Marina Point, supra,* 30 Cal.3d at page 742, this court chronicled the special housing needs of the elderly, and the "age-conscious" legislation aimed at meeting those needs, as evidence that public policy supported some age-based housing discrimination. The Legislature subsequently expressed its agreement. (See § 51.3.)

Children and elderly persons frequently have limited earning capacities which justify differential treatment in some circumstances. While women generally earn less than men, the societal remedy for this inequity has been equal employment opportunities. There is legislation on the books which seeks to lessen the gap in earnings between men and women. (See, e.g., Lab. Code, § 1197.5 [Equal Pay Act].)[18] By contrast, the vast majority of

---

[18]The nightclub attempts to justify its price discount as "remedial" because women tend to have lower incomes than men. This argument appears to be disingenuous at best. The club's profit motive is obvious. Jezebel's waives the cover charge for women not because women on the average earn 59 cents for every dollar earned by men (Koziara, Pierson & Johannesson, *The Comparable Worth Issue: Current Status and New Directions* (1983) 34 Lab. L.J. 504, 505), but because it wants to earn as many dollars as it can for itself. "Ladies' Night" at Jezebel's is not for the benefit of women, but for the benefit of the nightclub.

In fact, the testimony indicated that the club had directed several promotional offers at men, including a "Men's Night." This practice was instituted in order to increase business and, thereby, profits. It was discontinued because it failed to achieve that goal.

children are *incapable* of earning as much as adults and are, in fact, *prohibited* from working except under strict limitations. (See Lab. Code, § 1285 et seq.) For example, minors under the age of 16 may work only in occupations specified by statute (Lab. Code, § 1290). They are limited in the number of hours and the time of day they may work (Lab. Code, § 1391).

Similarly, many elderly persons have limited incomes. While efforts are being made to increase employment opportunities for senior citizens (see Unemp.Ins. Code, § 16000 et seq.), many are unable to work due to health problems. For others, retirement may even be legislatively encouraged or mandated. (See, e.g., *Rittenband* v. *Cory* (1984) 159 Cal.App.3d 410 [205 Cal.Rptr. 576] [upholding the constitutionality of a provision of the Judges' Retirement Law (Gov. Code, § 75000 et seq.) which decreases pension benefits to judges who fail to retire at age 70]; Gov. Code, § 20980 et seq.) In addition, our society has recognized that senior citizens are *entitled* to retire at some point in their lives.

Thus, price discounts for children or for the elderly are justified by social policy considerations as evidenced by legislative enactments. This is not true as to sex-based discounts. In fact, the Legislature has specifically provided for certain price discounts for senior citizens. (See, e.g., Veh. Code, § 13001 [permitting reduced transit fares]; Pub. Resources Code, § 5011 [providing for reduced rate passes to the state park system]; Ed. Code, § 89330 [providing for waiver of fees at California State University campuses].)

There may also be instances where public policy warrants differential treatment for men and women. For example, some sex-segregated facilities, such as public restrooms, may be justified by the constitutional right to personal privacy. (See Comment, *The Unruh Civil Rights Act: An Uncertain Guarantee* (1983) 31 UCLA L.Rev. 443, 462, fn. 98.) ▮ However, defendants' discriminatory pricing policies are in no way based on privacy considerations, nor are they justified by any other public policy which might warrant differential treatment based on sex.

The plain language of the Unruh Act mandates equal provision of advantages, privileges and services in business establishments in this state. Absent a compelling social policy supporting sex-based price differentials, such discounts violate the Act.

Jezebel's argues that it will be forced to close its nightclub business if it cannot charge a lower cover price to women one evening each week.[19] "However, such a fact, if it be a fact, is not determinative." (*Easebe Enterprises, Inc.* v. *Alcoholic Bev. etc. Appeals Bd.*, *supra,* 141 Cal.App.3d at p. 987.)

Moreover, Jezebel's has offered no reason why it could not charge a lower admission fee one night each week to men and women alike. This would encourage increased patronage by both sexes on equal terms. When faced with a similar question, the New York Human Rights Commission observed that "[p]erhaps, in their unending quest to serve best the social interests of the public, a Community Day at reduced prices irrespective of sex, rather than a Ladies Day with its attendant pricing based on sex, might well accomplish respondents' social concerns without violating the public policy of this State . . . ." (*Abosh* v. *New York Yankees, Inc.,* reprinted in Babcock et al., Sex Discrimination and the Law, *supra,* at p. 1070.) Such a solution might work equally well here.

Courts are often hesitant to upset traditional practices such as the sex-based promotional discounts at issue here. Some may consider such practices to be of minimal importance or to be essentially harmless. Yet, many other individuals, men and women alike, are greatly offended by such discriminatory practices.

The legality of sex-based price discounts cannot depend on the subjective value judgments about which types of sex-based distinctions are important or harmful. The express language of the Unruh Act provides a clear and objective standard by which to determine the legality of the practices at issue. The Legislature has clearly stated that business establishments must provide "*equal* . . . advantages . . . [and] privileges" to all customers "no matter what their sex." (§ 51.) Strong public policy supports application of the Act in this case. The defendants have advanced no convincing argument that this court should carve out a judicial exception for their sex-based price discounts. The straightforward proscription of the Act should be respected.

The judgment is reversed and the cause remanded to the trial court for further proceedings consistent with the views expressed herein.

Mosk, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

---

[19]The testimony of the nightclub personnel indicated that "Ladies' Night" is the night on which the club collects its greatest revenue.

Kaus, J.,* concurred in the result.

Lucas, J., concurred in the judgment only.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.