[No. G040669. Fourth Dist., Div. Three. Nov. 16, 2009.]

WILLIAM HOWE et al., Plaintiffs and Appellants, v.
BANK OF AMERICA N.A. et al., Defendants and Respondents.

COUNSEL

The Rava Law Firm and Alfred G. Rava for Plaintiffs and Appellants.

Morrison & Foerster, Arturo J. Gonzalez, William L. Stern and Claudia M. Vetesi for Defendants and Respondents.

OPINION

**BEDSWORTH, Acting P. J.**—Plaintiffs and appellants William Howe, Richard Boss and Bashir Ghazialam, acting on behalf of a putative class of "individuals of U.S. national origin and/or ancestry, as well as naturalized individuals," sued Bank of America N.A., Mexicana Airlines and Visa International Service Association (collectively Bank of America). Their com-

plaint was that these entities had discriminated against the class in violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) by requiring that United States citizens provide a Social Security number to open a particular type of credit card account, while allowing foreign nationals to open such accounts with only alternative forms of identification.

Bank of America demurred to the complaint, arguing it was required by federal law to obtain Social Security numbers from United States citizens seeking to establish credit card accounts; that federal law did not require banks to obtain Social Security numbers from foreign nationals; and that requiring such numbers from foreign nationals would effectively preclude those who were not eligible to obtain Social Security numbers from opening accounts. Given those circumstances, the policy of allowing foreign nationals, but not United States citizens, to obtain accounts without providing a Social Security number was a reasonable one. The trial court agreed with Bank of America and sustained the demurrer without leave to amend.

On appeal, plaintiffs reiterate the arguments advanced below, but we find them no more persuasive than did the trial court, and affirm the judgment.

## FACTS

The complaint alleges the gist of the action as follows: "[t]o increase their profits, Defendants have employed a credit card promotion that discriminates *against individuals of U.S. national origin and/or ancestry* in favor of foreign nationals. Defendants require *customers of U.S. national origin and/or ancestry* to produce Social Security numbers when applying for a credit card or opening a Bank of America bank account, but Defendants have not been requiring the same of foreign nationals, thereby discriminating against those of U.S. national origin and/or ancestry, as well as arbitrarily discriminating against these same disfavored individuals."[1] (Italics added.) The credit card program at issue allegedly allows credit card applicants who are not United States citizens to open an account with identification other than a Social Security number, including a "passport, nonresident alien Border Crossing Card, nonimmigrant Visa and Border Crossing Card, or a Mexican Matricula Card," as an alternative to the Social Security number required from United States citizens. Moreover, such foreign applicants are given the opportunity

---

[1] Despite that description, the alleged plaintiff class is not actually limited to those of "U.S. national origin and/or ancestry," but also includes "naturalized U.S. citizen[s] whose country of national origin is a foreign country." Specifically, plaintiff Bashir Ghazialam is alleged to be "a naturalized U.S. citizen born in Afghanistan."

"to deposit a minimum of $300 into a security collateral account to establish their credit line without a Social Security number. On the other hand, the . . . Credit Card Promotion does not offer U.S. nationals the security collateral account feature . . . . This security collateral account feature helps foreign nationals establish credit without a Social Security number, but it is not marketed towards U.S. nationals."

The complaint points out that even those foreign nationals who "are in the U.S. on a student or work visa and therefore are lawfully entitled to obtain a Social Security number, are not required to provide a Social Security number. On the other hand, a naturalized U.S. citizen whose country of national origin is a foreign country, must provide a Social Security number . . . ." It further alleges that "Defendants' Credit Card Promotion favors illegal immigrants over naturalized U.S. citizens even though the naturalized U.S. citizens obeyed the law and are in the U.S. legally."

The complaint alleges this promotion harms the plaintiff class in two ways. First, "by not requiring Social Security numbers of foreign nationals, [the promotion] may be jeopardizing the safety of every person in the U.S. because the lack of a Social Security number aids terrorists, provides a gateway to money laundering, encourages illegal immigration and identity theft, and defies or hinders U.S. laws—including immigration laws, the Patriot Act, and tax laws." And second, the promotion improperly favors foreign nationals over the plaintiff class, because "[b]y not having to provide Social Security numbers, foreign nationals are not as vulnerable to identity theft, do not have a damaging inquiry added to their credit report, and [do] not have to report to the Internal Revenue Service interest from these accounts, as U.S. nationals must." In other words, the complaint suggests it is both harmful to allow foreign nationals to open accounts *without* Social Security numbers, and harmful to *require* United States citizens and permanent residents to provide Social Security numbers.

Finally, the complaint alleges this promotion violates "several California anti-discrimination laws," but specifically identifies only the Unruh Civil Rights Act, as embodied in Civil Code sections 51 and 51.5. It alleges that the promotion is an example of both "arbitrary discrimination" and "discrimination based on national origin and/or ancestry."

The complaint seeks both monetary damages and an injunction prohibiting further "discriminatory practices." However, plaintiffs do not specify whether the requested injunction should (1) preclude Bank of America from allowing foreign nationals to apply for credit cards without providing a Social Security

number, or (2) preclude Bank of America from requiring United States citizens and permanent residents to provide Social Security numbers in applying for such cards.

Bank of America demurred to the complaint, arguing that it is required by federal law to obtain Social Security numbers from United States citizens who apply for credit cards, but is allowed to rely on alternative forms of identification for applicants who are foreign nationals. It noted that in light of the federal requirement, it could not relax the Social Security number requirement for United States citizens, and since not all foreign nationals qualified for Social Security numbers, the imposition of such a requirement on that group would preclude many of them from eligibility and likely be perceived as discriminatory. Under those circumstances, the decision to allow foreign nationals to apply for credit cards without a Social Security number was reasonable and nondiscriminatory. The Bank of America also argued that (1) plaintiffs had not alleged any cognizable harm to the putative class caused by either its requirement that they produce Social Security numbers to open a credit account, or its failure to require that foreign nationals provide Social Security numbers to open a credit account; and (2) to the extent a cause of action had been stated, the court should decline to consider it under the doctrine of equitable abstention, since adjudicating the credit practices of a federally regulated bank would delve too deeply into issues of economic policy, which is traditionally a legislative function.

Plaintiffs opposed the demurrer, arguing that Bank of America's credit card promotion was "designed to attract foreign nationals, who are in the United States legally and illegally, by not requiring foreign nationals to provide Social Security numbers when applying for a bank account and credit card." According to plaintiffs, this program was discriminatory because it denied them an opportunity to obtain an account on the same terms. Moreover, plaintiffs asserted that Bank of America's contention its policy merely reflected federally imposed identification requirements was based upon "extrinsic evidence," and thus was not cognizable in the context of a demurrer. But even if the court did consider Bank of America's federal law justification, plaintiffs argued that law established only minimum identification requirements for each group, and nothing therein precluded Bank of America from nonetheless "requir[ing] the same thing of everybody." Plaintiffs reasoned that in order to be in compliance "with the spirit of [the Patriot Act]," Bank of America should be asking foreign nationals "for more than pieces of meaningless paper, which is what they're doing now." Indeed, according to

plaintiffs, Bank of America's current policy amounted to "laughing at the Government," because "[t]he U.S. government is inept at controlling illegal immigration."

The court sustained the demurrer without leave to amend. The court reasoned that "[t]o the extent feasible, [defendant] is seeking viable useful identification from every applicant. [¶] The only way that we have identical standards of identification is to leave out vast numbers of people from the credit card program. And as [defense counsel] suggested, and seems obvious, that would surely bring to court a massive suit on behalf of the people excluded from the program. [¶] I don't express any opinion about whether that case would have validity, but it would inevitably be pursued on behalf of people that had no opportunity to obtain banking relationships here in the United States. [¶] So we're left with a plan that does permit vast numbers of noncitizens to participate in the banking business here in the United States on a basis that appears to the court to be the best and most reasonable process of getting identification. [¶] If we start from the premise that it can't be identical information, . . . then the best we can hope for is that it be the most reasonable and the most workable and the most logical under the circumstances. And this qualifies."

## DISCUSSION

"In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiff-appellant. Regardless of the label attached to the cause of action, we must examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. (*Black v. Department of Mental Health* (2000) 83 Cal.App.4th 739, 745 [100 Cal.Rptr.2d 39].) The judgment will be affirmed if it is proper on any of the grounds raised in the demurrer, even if the court did not rely on those grounds. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989 [94 Cal.Rptr.2d 643].) [¶] We will not, however, assume the truth of contentions, deductions, or conclusions of fact or law and may disregard allegations that are contrary to the law or to a fact which may be judicially noticed. When a ground for objection to a complaint, such as the statute of limitations, appears on its face or from matters of which the court may or must take judicial notice, a demurrer on that ground is proper. (Code Civ. Proc., § 430.30, subd. (a); *Black v. Department of Mental Health, supra,* 83 Cal.App.4th at p. 745.) We may take judicial notice of the records of a California court. (Evid. Code, § 452, subd. (d).) We must take judicial notice of the decisional and statutory law of

California and the United States. (Evid. Code, § 451, subd. (a).)" (*Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1554–1555 [92 Cal.Rptr.3d 219].)

The primary law at issue in this case is Civil Code section 51 et seq., commonly known as the Unruh Civil Rights Act (the Act). The Act provides that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, *ancestry, national origin,* disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b), italics added.)

■ Although the Act expressly lists certain classifications as falling within its protections, our Supreme Court has made it clear that the list is "illustrative rather than exhaustive." (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28 [219 Cal.Rptr. 133, 707 P.2d 195].) Thus, the Supreme Court has held that the Act generally prohibits discrimination based upon "personal characteristics." (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1161 [278 Cal.Rptr. 614, 805 P.2d 873].)[2]

■ However, the Act does not entirely prohibit businesses from drawing distinctions on the basis of the protected classifications or personal characteristics; rather, "[t]he objective of the Act is to prohibit businesses from engaging in *unreasonable, arbitrary or invidious discrimination.* (*Sunrise Country Club Assn. v. Proud* (1987) 190 Cal.App.3d 377, 381 [235 Cal.Rptr. 404].)" (*Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1174 [37 Cal.Rptr.3d 859], italics added.) Thus, "certain types of discrimination have been denominated 'reasonable' and, therefore, not arbitrary." (*Koire v. Metro Car Wash, supra,* 40 Cal.3d at p. 30.)

---

[2] Based upon that precedent, we need not concern ourselves with the point that plaintiffs in this case have not alleged any discrimination based upon a specific classification set forth in the Act. While the complaint expressly asserts that Bank of America is guilty of "discrimination based on national origin and/or ancestry," the facts it alleges reflect the bank actually drew a distinction among credit applicants based upon *United States citizenship or permanent residency,* rather than national origin or ancestry. Indeed, plaintiff Ghazialam is expressly alleged to be of Afghani national origin, and was purportedly harmed by defendants' conduct in his capacity as a "naturalized American" who was consequently required to produce a Social Security number as part of his credit card application process. The complaint also expressly alleges that a "naturalized U.S. citizen *whose country of national origin* is Mexico" is part of the group harmed by defendants' actions. For purposes of this opinion, we will assume, without deciding, that citizenship status would qualify as the type of "personal characteristic" which falls within the protection of the Act.

■ As explained in *Koire*, a public policy expressed by statute generally constitutes a reasonable basis for drawing distinctions on the basis of classifications otherwise protected by the Act: "For example, it is permissible to exclude children from bars or adult bookstores because it is illegal to serve alcoholic beverages or to distribute ' "harmful matter" ' to minors. ([*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721,] 741 [180 Cal.Rptr. 496, 640 P.2d 115], citing Bus. & Prof. Code, § 25658 and Pen. Code, § 313.1.) This sort of discrimination is not arbitrary because it is based on a 'compelling societal interest' ([30 Cal.3d] at p. 743) and does not violate the Act." (*Koire v. Metro Car Wash, supra,* 40 Cal.3d at p. 31, fn. omitted.)

■ Moreover, "California appellate cases have also recognized that legitimate business interests may justify limitations on consumer access to public accommodations. (See, e.g., [*In re*] *Cox*[ (1970)] 3 Cal.3d [205,] 217 [90 Cal.Rptr. 24, 474 P.2d 992] ['A business establishment may, of course, promulgate reasonable deportment regulations that are rationally related to the services performed and the facilities provided.']; *Frantz* v. *Blackwell* (1987) 189 Cal.App.3d 91, 95–96 [234 Cal.Rptr. 178] [refusal to sell house to speculator in potential competition with defendant did not violate the Act]; *Reilly* v. *Stroh* (1984) 161 Cal.App.3d 47, 53 [207 Cal.Rptr. 250] [segregation of persons under 21 in restaurant not arbitrary in view of legal requirements imposed on proprietor relating to consumption of alcoholic beverages by minors]; *Ross* v. *Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988, 992–993 [203 Cal.Rptr. 468] [cemetery's policy of private funerals that excluded 'punk rockers' did not violate the Act]; *Wynn* v. *Monterey Club* (1980) 111 Cal.App.3d 789, 798 [168 Cal.Rptr. 878] [agreement to bar from gambling establishment a pathological gambler who had written bad checks was 'good business and social practice' that did not violate the Act].) In each case, the particular business interests of the purveyor in maintaining order, complying with legal requirements, and protecting a business reputation or investment were recognized as sufficient to justify distinctions among its customers." (*Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1162; accord, *Hessians Motorcycle Club v. J.C. Flanagans* (2001) 86 Cal.App.4th 833, 838 [103 Cal.Rptr.2d 552].)

Plaintiffs seem to be arguing that the "arbitrariness" of a distinction is relevant only in cases involving those classifications not specifically listed in the statute (such as age), and that drawing distinctions based upon the statutory classifications is entirely prohibited even where reasonable. We cannot agree. In *Koire v. Metro Car Wash, supra,* 40 Cal.3d 24, a case involving allegations of discrimination on the basis of sex—a statutory classification—the Supreme Court both explained and applied the "arbitrari-

ness" rule, concluding that while some gender-based distinctions would be permissible (separate restrooms), others would not ("Ladies' Day" discounts): "There may also be instances where public policy warrants differential treatment for men and women. For example, some sex-segregated facilities, such as public restrooms, may be justified by the constitutional right to personal privacy. [Citation.] However, defendants' discriminatory pricing policies are in no way based on privacy considerations, nor are they justified by any other public policy which might warrant differential treatment based on sex. [¶] The plain language of the Unruh Act mandates equal provision of advantages, privileges and services in business establishments in this state. Absent a compelling social policy supporting sex-based price differentials, such discounts violate the Act." (*Id.* at p. 38.)[3]

Thus, the issue in this case boils down to this: did Bank of America act "arbitrarily" when it required United States citizens to provide a Social Security number to open a credit card account, while allowing foreign nationals to open one using an alternative form of identification? We heartily agree with the trial court's conclusion it did not.

■ As Bank of America points out, federal regulations specifically require it to obtain a Social Security number from any United States citizen who opens an account. Title 31 Code of Federal Regulations part 103.121(b) (2009) requires Bank of America to "implement a written Customer Identification Program (CIP) . . . that, at a minimum, includes each of the requirements of paragraphs (b)(1) through (5) of this section." Among those requirements is that Bank of America must obtain certain information from each customer, including a "taxpayer identification number"—otherwise defined as a Social Security number—for individual United States citizens. (31 C.F.R. § 103.121(b)(2)(i)(4)(i) (2009).) However, the regulation specifies that when an individual customer is not a United States citizen, Bank of America may obtain either a Social Security number, or some alternative "identification number," including a "passport number and country of issuance; alien identification card number; or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard." (31 C.F.R. § 103.121(b)(2)(i)(4)(ii) (2009).)

---

[3] In any event, as noted in footnote 2, *ante*, plaintiffs did not actually allege any discrimination based upon a classification listed in the Act. Consequently, even if they were correct in suggesting that "arbitrariness" is relevant only when assessing other types of discrimination, this case would fall within that rule.

 Because that regulation, which was enacted pursuant to the legislation commonly known as "The USA Patriot Act,"[4] expressly requires Bank of America to obtain Social Security numbers from United States citizens, Bank of America has no choice but to do so, and we thus conclude, as a matter of law, that Bank of America did not act arbitrarily in requiring Social Security numbers from its United States citizen account holders.

However, plaintiffs' alternative contention is that because the federal regulation imposes only "minimum" identification requirements, there was nothing in the regulation which prohibits Bank of America from imposing a strict Social Security number requirement on *all account holders*, including those who are not United States citizens, and thus it violated the Act by failing to require that all individual account holders, both United States citizens and foreign nationals, provide a Social Security number. We are not persuaded.

The distinction between the types of identification numbers required for United States citizens and foreign nationals is one created by federal law, not by Bank of America, and presumably reflects a determination that the alternative identification numbers which may be used by foreign nationals effectively serve the same purposes as a Social Security number. For Bank of America to depart from those required minimums by imposing stricter requirements on foreign nationals, but not on United States citizens, might itself appear discriminatory in the context of the regulatory scheme, and thus might subject Bank of America to litigation. Even if that litigation were not successful (and like the trial court, we express no opinion on the point), Bank of America nonetheless has a strong incentive to avoid the expense and controversy associated with defending such a claim. Consequently, we conclude Bank of America did not act "arbitrarily" when it simply applied the minimum identification standards imposed by federal law to *both* foreign nationals and United States citizens seeking to obtain a credit account.

"Unruh Act issues have often been decided as questions of law on demurrer or summary judgment when the policy or practice of a business establishment is valid on its face because it bears a reasonable relation to commercial objectives appropriate to an enterprise serving the public." (*Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1165.) Because Bank of America's credit card program merely applied federally imposed minimum identification standards to *all applicants* for its accounts, whether United States citizens or foreign nationals, we conclude that practice bore a reasonable relationship to Bank of America's commercial objectives

---

[4] "USA Patriot Act" is an acronym for "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism." (8 U.S.C.A. § 1701(7).)

and was consequently valid on its face. The trial court did not err in sustaining Bank of America's demurrer to plaintiffs' complaint without leave to amend.

The judgment is affirmed. Respondents are to recover their costs on appeal.

O'Leary, J., and Aronson, J., concurred.

On December 8, 2009, the opinion was modified to read as printed above.