Filed 2/17/15  Jones v. Wells Fargo Bank CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| OPAL JONES, et al., | B237282 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. BC337821) |
| WELLS FARGO BANK, N.A. etc., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge.  Affirmed.

Skadden, Arps, Slate, Meagher & Flom, Harriet S. Posner, Carl Alan Roth, Kevin J. Minnick, Allison B. Holcombe and Eric Waxman for Defendants and Appellants.

Cappello & Noel, A. Barry Cappello, Leila J. Noel and Wendy D. Welkom; Pine & Pine and Norman Pine for Plaintiffs and Respondents.

_____

In August 2005, Opal Jones, Claudia A. Caldwell, Kalina Iovcheva, Vincent Jones and C. Renae Walker Jones (plaintiffs) filed a lawsuit against Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage (collectively WF). The plaintiffs were all customers of a Los Angeles area branch office of WF who obtained loans to purchase homes. They claimed that during the application process, WF denied them access to a computer program for obtaining favorable rates on those loans based on the ethnic makeup of the neighborhood of the branch office. They alleged causes of action for violation of the Unruh Act (Civ. Code, § 51), the Fair Employment and Housing Act ( FEHA, Gov. Code, § 12900 et seq.), the Consumer Legal Remedies Act (CLRA, Civ. Code, § 1750 et seq.), the Unfair Competition Law (UCL, Bus. & Prof. Code, § 17200) and breach of contract.

The trial court certified a class on the Unruh Act cause of action in August 2009.

Shortly before trial, WF moved to decertify the class and the trial court denied the motion on November 8, 2010.

A jury trial on the class action on the Unruh Act cause of action commenced in November 2010. In March 2011, the jury returned a verdict finding WF liable to the class on the Unruh Act cause of action, and awarded statutory damages of $3.52 million.[1]

WF made another motion to decertify the class on June 29, 2011, which the court denied.

The judgment was entered on September 12, 2011, in the amount of $3.52 million plus interest on behalf of the entire class. WF appealed, contending the trial court should not have certified the class and then erred in denying the subsequent motions to decertify the class.

---

[1] The trial also included individual FEHA claims for plaintiffs Opal Jones, Victor Jones, Claudia Caldwell, Renae Walker Jones, and Iovcheva, breach of contract claims for Opal Jones, Vincent Jones, Claudia Caldwell, Renae Walker Jones, and Iovcheva. The jury found WF liable on the individual claims of some of the plaintiffs but those findings are not at issue in this appeal.

In November 2011, plaintiffs filed a motion for attorney fees, seeking an award of $15,753,101.  Subsequently the trial court held a hearing on the motion and awarded plaintiffs $4,988,330.  Plaintiffs appealed that ruling in a separate case, No. B243333.

On June 18, 2012, the trial court stayed execution of the judgment until all appeals became final.

Plaintiffs moved to consolidate this appeal with No. B243333.  On March 21, 2014, we denied that motion but agreed to consider the appeals concurrently for the purposes of oral argument and decision. [2]

## FACTUAL & PROCEDURAL BACKGROUND

### 1. Preliminary Matters

#### a. Appendices

WF's opening brief was filed on July 17, 2012.  It concurrently filed an application to file its Appellant's Appendix under seal pursuant to California Rules of Court, rule 846(c).  It filed a redacted version of the Appellant's Appendix.  On August 14, 2012, the court denied the motion and the non-redacted Appellant's Appendix was filed on August 29, 2012.

Plaintiffs' responsive brief on appeal was filed January 28, 2013.  Concurrently with the filing of its reply brief, WF filed 14 volumes of Reply Appendices. The Reply Appendices contain declarations filed in support of and in opposition to the initial motion for class certification, plaintiffs' objections thereto and declarations submitted in support of plaintiffs' reply brief.

Plaintiffs filed a motion to strike the Reply Appendices and requested sanctions arguing WF should not be allowed to augment the record.

---

[2]     Case No. B243333 is addressed in a separate opinion.

WF filed an opposition to the motion, contending its initial Appellant's Appendix contained all items necessary for proper consideration of the issues. It claimed in its reply brief that it added to the Appendix "to the extent that Plaintiffs contend that the Appendix was somehow inadequate" and to counter allegations that WF waived arguments.

California Rules of Court, rule 8.124(b) provides that: "(3) An appendix must not: (A) Contain documents or portions of documents filed in superior court that are unnecessary for proper consideration of the issues; . . . (6) An appellant's reply appendix may contain any document that could have been included in the respondent's appendix."

Thus the filing of additional documents in a reply appendix is permissible. It is clear that the documents in the 14-volume Reply Appendix could be useful to the court in consideration of the appeal, since they all involve the motions for certification; however as WF concedes, none of them are "necessary." For these reasons we deny plaintiffs' motion to strike and allow the filing of the additional appendices and decline to impose sanctions.

*b. WF's corporate structure*

At WF, loan officers, known as Home Mortgage Consultants (HMCs or loan officers) were based in neighborhood branches. Each loan officer reported to a branch manager. The branch managers were under the supervision of Area Managers, grouped by geographic area. The Area Managers were under the supervision of the Regional Managers.

*c. The Loan Economics Program*

Loan Economics was a computer program unveiled by WF in March 2002. It was created to improve prices and to help loan officers achieve more volume and profitability.

To make a standard commission on a home mortgage loan, a loan officer would have to charge one percent of the loan value (origination point) over WF's daily loan rate. This was referred to as "101 pricing." If less than 101 pricing was charged (referred to as "underage"), the loan officer's commission would decrease. Anything higher than 101

4

pricing was termed "overage" and the loan officer would receive part of the overage revenue as an additional commission.

Loan Economics allowed loan officers to charge less than 101 pricing without suffering an underage penalty. Loan Economics also allowed loan officers to lower prices if the loan officer's loans in any given month exceeded a certain minimum level.

WF's stated policy was that all home loans were to be priced using this tool. All branch managers and loan officers in Los Angeles were supposed to be trained to use it to assess the profitability of every loan.

*d. The Lawsuit*

The theory of plaintiffs' lawsuit was that loan officers in the branches which were located in so-called minority neighborhoods (as defined by census reports) were prohibited from using the Loan Economics program by senior bank officials based solely on the ethnic makeup or income level of the neighborhoods.

The plaintiffs named in the initial complaint applied for and obtained real estate loans from WF through the Culver City branch, a "minority neighborhood branch." The complaint defined a minority neighborhood as "predominantly African American and Hispanic."

During the relevant time periods, the Culver City Branch Manager was Pam Jackson. Her Area Manager (the South Los Angeles area) was Tom Swanson until 2003, when he was elevated to Regional Manger. The South Los Angeles area was then divided into two areas: West side (under Ken Vils) and East side (under Larry Garcia).

WF's defense was that pricing a home loan was a highly subjective and individualized process. It claimed that the Loan Economics program results in a calculation showing whether the income expected from the loan meets the minimum profitability thresholds for the loan officers. It argued there is no way to tell whether a loan officer used the program by looking at the loan commission reports, that each loan officer chooses how to price a loan and is subject to incentives and pressures and that Loan Economics could be used at different times or not at all.

*2. The Certification Motions*

   *a.  The First Motion*

In April 2008, plaintiffs brought their first motion to certify a class.  The motion was based on declarations of attorneys attaching deposition testimony of witnesses.

Plaintiffs offered this definition of the class: All borrowers who: (1) obtained a first trust deed-secured home loan from WF in an amount in excess of $150,000; (2) applied for the loan through a WF branch that was located within Thomas Swanson's area, as that area was defined by WF in January 2002, and was either within or within one mile from an area comprised of 50 percent or more minority population as established by 2000 census data and (3) had a loan funded between May 1, 2002 and December 2005.

This class differed from the class definition alleged in the original complaint.[3] Plaintiffs roughly estimated the class as greater than 10,000 members based on WF's produced loan volume reports.

Plaintiffs contended the class was easily ascertainable through WF's files and data base, as reflected in the loan volume reports WF produced.  They argued that the questions common to the class were: (1) whether WF precluded certain branch managers or loan officers from using the Loan Economics program; (2) whether Loan Economics enabled the loan officers to give borrowers a lower price loan; (3) whether WF's limiting of the Loan Economics program had a disparate impact on minority borrowers; (4) whether WF's conduct was intentional discrimination; (5) whether WF's limitation of the Loan Economics program resulted in damages to the affected borrowers and (6) the proper measure of damages and/or restitution.

---

[3]    The complaint defined the class as: all borrowers who obtained a first trust deed-secured home loan from WF in an amount in excess of $150,000, who applied for the loan through a WF branch office located in a minority neighborhood in the Los Angeles area, and whose loan was not processed, prepared, originated and/or generated by or with the use of the Loan Economics program.

Plaintiffs framed the common issues of law by the causes of action in the complaint. They contended the class damages were susceptible of proof, in particular, the statutory damages pursuant to the Unruh Act, and argued that to the extent class members may be required to establish individual damages, those individual issues did not predominate over the common issues of law and fact. They alleged the representative plaintiffs' claims arose from the same discriminatory conduct by WF and were based on the same legal theory. They argued the representative plaintiffs had strong identical interests with the members of the class and they had an identical interest in recovering for the losses that the other class members had sustained. They claimed the class representatives would adequately represent the class because the named plaintiffs' interests were not antagonistic to those of the class. They argued that class treatment was the superior mechanism for managing this litigation because it was impractical to join all members of the class in a single action and there was no alternative procedure which would result in a uniform determination of liability and which would provide the class members with the full extent of the relief to which they were entitled. They argued that if the class was not certified, there would be a multiplicity of duplicative lawsuits which would have conflicting decisions. Finally, they contended it was economically feasible for the class members to pursue relief in a class action because the individual borrowers would be forced to prove identical facts in successive trials, and might not have the ability to obtain information about WF's lending practices and would thus be unlikely to discover the discrimination by WF.

Following the hearing on July 22, 2008, the parties submitted supplemental briefs and the court took the matter under submission.

In August 2009, the court issued a written order certifying the class as to the Unruh Act cause of action. Its order stated, inter alia, "Plaintiffs estimate that the class consists of roughly 10,000 members. This number is sufficient to meet the numerosity requirement. [¶] . . . The class is defined in terms of where an individual applied for a loan, not where it was approved or processed. . . . . [¶] . . . Defendants' reports list each loan with its originator, who is usually a branch manager. From these records Plaintiffs

7

can locate and depose the various branch managers to identify which HMCs worked in which locations.  Only about 20 branch managers are involved.  This is a reasonable approach to identifying class members.  [¶]  Plaintiffs have carried their burden to establish that the proposed class is ascertainable. [¶¶]  Plaintiffs identify several common questions of law and fact, chief among which is whether Defendants had a policy of precluding certain branch managers/loan officers from pricing and closing loans with the Program.  Other common questions (according to Plaintiffs) include whether the Program enabled loan officers to offer the borrower a lower-priced loan, whether Defendants' alleged selective preclusion had a disparate impact on minority borrowers, whether Defendants' conduct constituted intentional discrimination, whether the policy damaged the affected borrowers, and if so, what is the proper measure of damages.  [¶]  Some of these common questions are not common at all.  [¶¶]  The issue of actual damages requires individual inquiries that will swamp any issues that are common to the class, at least with respect to those causes of action requiring a showing of actual damages.  This includes Plaintiffs' CLRA, UCL, FEHA and breach of contract causes of action.  Therefore, the court DENIES Plaintiffs' motion for class certification as it pertains to these causes of action.  [¶¶]  The court finds that issues of liability under the Unruh Act in this particular case are ripe for class treatment.  The most significant issue—whether Defendant[s] had a policy to deny access to the Loan Economics Program to HMCs in minority communities—is common to all class members.  [¶]  Because statutory penalties of at least $4,000 are mandatory under Section 52 once liability is established, there is no need to wade into individual issues surrounding actual damages.  This is only true, however, if Plaintiffs restrict the class-wide relief to statutory damages and in their notice inform class members that participation in the class waives any further rights to actual damages. [¶¶]  Plaintiffs have established that their Unruh Act claims are typical. . . . Plaintiffs' claims are typical because they are members of the communities at issue and obtained home loans from Defendants during the relevant time period.  Each loan was processed through Isaac Brooks, who purportedly was not able to use the Program and who worked out of offices in the relevant area.  Plaintiffs' claims arise from the same

alleged discriminatory conduct and proceed under the same legal theories. . . . [¶¶] There is no question that Plaintiffs have asserted all claims that reasonably could be expected to be raised by members of the class. Likewise, there is no evidence to suggest that Plaintiffs' interests are at odds with the remainder of the class. There is also no evidence suggesting that Plaintiffs are mere puppets for class counsel. All of them truly applied for home loans. Finally, class counsel have established their qualifications to represent the class. . . . [¶¶] . . . [T]he court finds that class treatment is superior for the Unruh Act cause of action. [¶] While class members may have an interest in controlling their own litigation where disparate damages are involved, there is little need for individual control where liability can be determined across the board as it can with Plaintiffs' Unruh Act cause of action. In addition, because damages are not an issue for those willing to forgo actual damages, the risk of management difficulties is reduced. There is no evidence of any litigation by individual class members already in progress involving the same controversy, which means there is little risk of inconsistent rulings. Finally, consolidating all claims in a single action before this court promotes judicial economy.

### b. Pre-trial Motion to Decertify

On September 10, 2010, shortly before trial, WF moved to decertify the class.

WF contended that plaintiffs could not show that common issues would predominate over individual ones. It argued that the Unruh Act requires proof of injury and causation, and that the plaintiffs would have to prove claims individually because loan officers used Loan Economics in a variety of ways and the use of the Loan Economics program did not necessarily result in a lower price.

The court denied the motion, stating it would allow the case go to trial and it would revisit the issue thereafter.[4]

---

[4]  It stated, "Maybe this time an appellate court will look at the issue of what is harm under the Unruh Act . . . . But at any event, it's easier for me to unring the bell than to ring the bell. . . . But I still have the ability to decertify this class if, as we get

9

*c. The Trial*

At trial, Plaintiffs presented the testimony of several loan officers in the region managed by Swanson who testified they never used Loan Economics because they were never told about or trained on the program. Some testified they were affirmatively told by Swanson or their branch manager not to use it. Some testified that if they moved to other branches in non-minority or more affluent areas, they were allowed to and told to use the program. Other WF employees testified Loan Economics was a cost-lowering tool and that WF's policy was to use it on every loan.

At trial, plaintiffs' expert Jeffrey West testified. He was an economic consultant who had experience creating demographic maps based on census information and had performed statistical analyses on demographic data. He had reviewed the Loan Volume Reports WF had provided to plaintiffs which showed all loans funded in the Los Angeles area from 2002-2005. The report named loan officers and branch managers. There were approximately 60,000 home loans over $150,000 funded in that period. WF also produced reports on the race and ethnicity of the borrowers.

West created maps showing where more than 50 percent of the population was African-American or Hispanic, based on census data. Using WF's data, West identified the branches which were within a one-mile radius of these minority areas and listed the 16 branch managers. He assumed all the branches in the minority areas were not using the Loan Economics Program and came up with 7,348 loans and categorized them by loan officer.

---

into trial, I realize I made a mistake. . . . I've got some real questions about whether this is a class . . . but I'll let this case go further as a class. . . . But I have got grave concerns about the number of people in this class who may not experience any monetary loss whatsoever or any monetary disadvantage whatsoever because of the failure to use Loan Economics. . . ."

Another plaintiffs' expert, Dr. Snow, testified that class loans obtained by class members on average, were priced 23 basis points higher than borrowers who were from areas in which the Loan Economics program was used. He did not perform any analysis on individual loans.

WF presented the testimony of some branch managers that loan officers were allowed to use Loan Economics under certain circumstances and that the program did not always offer the lowest price possible.

At the close of evidence, WF presented a verdict form which had seven questions with subparts and two appendices. Appendix A was a list of loan officers. Appendix B was a list of loans that was over 185 pages. It separated each loan into categories of branch manager, loan originator, borrower's race, loan amount, type of loan, total price points and funding date.[5]

---

[5]    The form asked:

"1.    Have the Plaintiffs proved by a preponderance of the evidence that, during the period of May 2002 through December 2005, the Loan Economics tool was an advantage, facility, privilege, or service provided by Wells Fargo to its borrowers?

"2.  Have the Plaintiffs proved by a preponderance of the evidence that Wells Fargo denied, discriminated, or made a distinction that denied full and equal advantages, facilities, privileges or services to class members who obtained their loans from the Wells Fargo branches managed by any of the branch managers listed in Appendix A?

"3.  Have the Plaintiffs proved by a preponderance of the evidence that the class members' race, color, ancestry, or national origin was a motivating reason for Wells Fargo's conduct; or that the race, color, ancestry or national origin of a person whom the class members were associated with was a motivating reason for Wells Fargo's conduct?

"4.  Have the Plaintiffs proved by a preponderance of the evidence that Wells Fargo's conduct was a substantial factor in causing harm to the following groups of class members? [answer divided into loan priced above par versus fixed-price loans]

11

Instead of WF's form, the court used a modified version of plaintiffs' special verdict form which required the jury to find each element of the Unruh Act without any connection to a particular loan, then required the jury to find the number of loans on which WF was liable.

The verdict form asked five questions:

"1. Did Wells Fargo deny, discriminate or make a distinction that denied full and equal advantages, facilities, privileges and/or services to Plaintiffs and the class they represent?

"2. Was the race, color, ancestry, and/or national origin of the Plaintiffs and the class they represent, or the race, color, ancestry, and/or national origin of persons whom the Plaintiffs and the class they represent were associated with, a motivating reason for Wells Fargo's conduct?

"3. Was Wells Fargo's conduct a substantial factor in causing harm to Plaintiffs and the class they represent?

---

"5. For the branches that received a check mark on Appendix A for question 2, have the Plaintiffs proved by a preponderance of the evidence that Wells Fargo's conduct was a substantial factor in causing harm to the members of the class who obtained their loans from those branches. [¶] . . . [¶] If your answer to question 5 is yes, then proceed to Appendix B and place a check mark next to each loan for which the borrower was harmed. For this question, you should ignore the loans associated with any branch manager that did not received a check mark for question 2. . . . .

"6. For the members of the class whose loans were originated during the class period after October 28, 2004, did the Plaintiffs prove by a preponderance of evidence that Wells Fargo denied, discriminated, or made a distinction among its customers that denied full and equal advantages, facilities, privileges or services to class members?

"7. For the members of the class whose loans were originated during the class period before July 1, 2002, did the Plaintiffs prove by a preponderance of evidence that Wells Fargo denied, discriminated, or made a distinction among its customers that denied full and equal advantages, facilities, privileges or services to class members?" (Original underlining.)

"4. Plaintiffs and the class they represent are entitled to damages on the following total number of loans [fill in number of loans below]:

"5. Taking the total number of class loans you have found in answer to Question 4, and multiplying that total number of loans by the amount of $4,000 per loan, what is the total amount of damages that you award to Plaintiffs and the class they represent?"

The jury answered the verdict by finding that Plaintiffs were entitled to damages on 880 loans. All the parties and the court agreed it was impossible to identify which 880 loans were the basis of the jury's verdict.

After the trial, plaintiffs moved for preliminary approval of a proposed plan of redistribution under which the 7,348 victims would share the $3.52 million award.

*d. Post-trial Motion*

WF then moved to decertify the class in June 2011.

This post-trial motion to decertify contended that the proof presented at trial demonstrated that plaintiffs could no longer sustain the prerequisites for class certification. WF argued that answering the questions central to each plaintiff's Unruh Act claim required individualized scrutiny of each loan transaction. It claimed that the jury needed to consider whether Loan Economics was used on each particular loan, and whether the alleged failure to use Loan Economics raised the price on the borrowers' loan.

The court denied this motion, stating, inter alia: "If we had submitted the defendant's verdict, we would have been giving the jury the world almanac. . . . [M]aybe when we get down toward distribution, we'll have some questions about who gets money. Do we have to funnel the money to 880 borrowers or do we funnel the money to the entire class? And does it make a difference to the defendants because if due process is not violated, then the manner of distribution may not be that significant in terms of grist for the defendants to complain. . . ."

Plaintiffs proposed distributing the award among all the 7,348 class members because it could not be ascertained from the verdict who the 880 borrowers were. The court approved this plan.

13

## DISCUSSION

### 1. *The Unruh Act*

The Unruh Civil Rights Act (the Unruh Act), codified in Civil Code section 51, et seq., provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Civil Code section 52, subdivision (a) provides that anyone who violates the Act "is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, . . . ."

The Act must be construed liberally. (*Angelucci v. Century Supper Club* (2007) 41 Cal. 4th 160, 167 (*Angelucci*).)

### 2. *Allegations of the Complaint*

The cause of action for violation of the Unruh Act alleged that WF, a business establishment, engaged in systemic and purposeful discriminatory home lending practices by denying plaintiffs and the members of the proposed class full and equal advantages, privileges and services when they obtained home financing from WF because: (1) they are African-American, Hispanic and/or other minority, (2) they live and/or do business in predominantly African-American and/or Hispanic neighborhoods and (3) they associate with African-American and/or Hispanic spouses, neighbors and/or businesses.

### 3. *Class Certification*

The class action procedure, codified in Code of Civil Procedure section 382, rests on considerations of necessity and convenience and was adopted to prevent a failure of justice. (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1078.) Code of Civil Procedure section 382 authorizes class actions when the question is one of a common or

general interest, of many persons, or when the parties are numerous and it is impracticable to bring them all before the court.

The community of interest requirement is determined by three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. (*Sav-On Drug Stores v. Superior Court* (2004) 34 Cal.4th 391, 326.)

The party seeking class certification has the burden to establish the existence of: (1) an ascertainable class and (2) a well-defined community of interest. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913.)

A trial court ruling on a certification motion must determine whether the issues which may be tried jointly are so numerous or substantial compared with those requiring separate adjudication that the maintenance of a class action would be advantageous to the litigants and to the judicial process. (*Sav-On, supra*, 34 Cal.4th at p. 326.) The decision to certify a class or not is squarely within the trial court's discretion. (*Brinker Restaurant v. Superior Court* (2012) 53 Cal.4th 1004, 1021-1022*; In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311.) "'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.'" (*Sav-On, supra*, 34 Cal.4th at pp. 325-326.)

"In conducting this analysis, a court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule, if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Brinker, supra*, 53 Cal.4th at pp. 1021-1022.)

Class certification is properly denied when the proposed definition of the class is overbroad and the plaintiff offers no means by which only those class members who have claims can be identified from those who should not be included in the class. (*Miller v. Bank of America* (2013) 213 Cal.App.4th 1, 7.)

15

On review of a class certification order, we afford the trial court's decision great deference on appeal, reversing only for a manifest abuse of discretion. A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) relies on improper criteria, or (3) rests on erroneous legal assumptions. (*Ayala v. Antelope Valley* (2014) 59 Cal.4th 522, 530; *Fireside Bank, supra*, 40 Cal.4th at p. 1089.)

In reviewing the certification order, we presume the existence of every fact the trial court could reasonably deduce from the record. (*Sav-On, supra*, 34 Cal.4th at p. 326.) When a certification order turns on inferences to be drawn from the facts, we have no authority to substitute our decision for that of the trial court. (*Id.* at p. 328; *Davis-Miller v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 106, 120.) We review only the reasons given by the trial court for its ruling and ignore any other grounds that might support denial. Any valid pertinent reason stated for the certification order will be sufficient to upheld the order. (*Sav-On, supra,* 34 Cal. 4th at pp. 326-327; *Ramirez v. Balboa* (2013) 215 Cal.App.4th 765, 776-777.)

We also consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. (*Sav-On, supra,* 34 Cal.4th at p. 339.) The court should not focus on the merits of the case unless necessary. (*Ayala, supra*, 59 Cal.4th at p. 537.) When issues affecting the merits of the case overlap with the propriety of class certification, a court may inquire into the case's merits. (*Brinker, supra*, 53 Cal.4th at pp. 1023-1024.)

Decertification motions are reviewed according to the same standards, that is a question of whether the class action proceeding is appropriate and whether the trial court abused its discretion in ruling on the motion. (*Walsh v. Ikon Office Solutions* (2007) 148 Cal.App.4th 1440, 1451; *Grogan-Beall v. Ferdinand Roten Galleries* (1982) 133 Cal.App.3d 969, 977.)

*4. Contentions on Appeal*

WF contends on appeal that the superior court wrongly assumed that there was no need to prove actual damages in order to have an Unruh Act statutory penalty imposed, and thus the motion to certify the class should have been denied.

WF then makes the related contention that the price discrimination theory of liability required plaintiffs to show that each class member overpaid for his or her loan in order to establish injury and thus class certification was not appropriate.

Next it contends that the court erred in denying the subsequent motions to decertify because it allowed the plaintiffs to prove their injury with averages rather than direct evidence of overpayment, and thus abridged WF's due process rights by permitting a class containing non-claimants to go to trial.

Finally it contends that the court erred in denying WF's motion for a special verdict form that would have aided the jury in identifying which loans proved harm and causation.

Because WF objects to three rulings, all of which concern the right of plaintiffs to proceed as a class, we address the certification question as a whole and not as to each individual ruling, except as to the due process and distribution issues.

The underlying premise of all WF's contentions on appeal hinges on the legal elements of an Unruh Act cause of action. WF contended before trial, during trial and after trial that plaintiffs had to show that a borrower at a minority branch received less favorable loan treatment because of the loan officer's failure to use the Loan Economics program. Thus, they argue, if it can be shown that a borrower was offered the same interest rate without the Loan Economics program as he or she would have been offered when using the program, there would be no injury or damages, and the borrower could not be considered a member of the class. It argues that because of the necessity of individualized inquiry class treatment was not an appropriate method of trying this case.

We therefore first address the Unruh Act requirements.

5. *Elements of an Unruh Act Claim*

Plaintiffs elected to proceed under the statutory penalty prong of the Unruh Act, that is, those who violate the Act are liable for "actual damages, and any amount that maybe determined by a jury. . . up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000) . . . ."

17

What plaintiffs claim and the trial court found, is that there was no need to establish whether the individual claimants received less favorable loan terms because the injury consisted of the denial of the use of the program to minority branch applicants, and was not measured by the cost of the loan. The trial court and plaintiffs relied primarily on *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24 (*Koire*) and *Angelucci, supra,* 41 Cal.4th 160.

WF contends plaintiffs have no standing to bring an Unruh Act claim because they were not denied loans and could not prove damages because they did not show they received less favorable terms than applicants at other branches which used the Loan Economics program.

In *Koire*, *supra*, 40 Cal.3d 24, a male visited car washes and bars on days during which discounts were offered to females. He asked to be charged the same price as a female would be charged and was refused. (*Id*. at p. 27.) After he filed a lawsuit against the businesses based on the Unruh Act, the trial court granted judgment in favor of the defendants. The California Supreme Court found the Unruh Act applied to gender-based price discounts. In response to the defendants' argument that the plaintiff was not injured by the price discounts, the court found: (1) the Unruh Act provides that arbitrary sex discrimination is per se injurious regardless of the plaintiff's actual damages (*id*. at p. 33); and (2) the plaintiff was adversely affected by the price discounts because he had to pay a higher price and because the price differential made him feel he was being treated unfairly (*id*. at p. 34).

Several years later, in *Angelucci, supra*, 41 Cal.4th 160, four men filed a complaint against a supper club which charged lower prices to females. The trial court granted judgment on the pleadings in favor of the club. (*Id*. at p. 165.) The Supreme Court reversed the judgment. In doing so, it specifically rejected the club's assertion that *Koire* required plaintiffs in an Unruh Act price discrimination case to allege that they demanded equal treatment and were refused. The court found no language in the Unruh Act which requires the plaintiff to demand and be refused equal treatment. It explained *Koire*'s holding that the plaintiffs were injured when they presented themselves for

18

admission and were charged the nondiscounted price (*id*. at p. 173) and that injury occurs when the discriminatory policy is applied to the plaintiff. (*Id*. at p. 175.)

The court then discussed the rules of standing and concluded that under the Unruh Act, a plaintiff has standing when he or she alleges injury or "has been the victim of the defendant's discriminatory act" (*id*. at p. 175) or an "'invasion of legally protected interests.'" It found that the Unruh Act does not require plaintiffs to express their request for a discounted price in order to state a cause of action. (*Id*. at p. 180.)

WF relies on two cases decided subsequent to *Angelucci* for their contention that plaintiffs have no standing to bring an Unruh Act cause of action.

In *Surrey v. TrueBeginnings* (2009) 168 Cal.App.4th 414, the court of appeal addressed the standing of a male plaintiff who visited a dating services website with the intent of utilizing its services, but after discovering that women were offered free enrollment, did not subscribe or pay to enroll. (*Id*. at p. 416.) The court found that because the plaintiff "did not attempt to or actually subscribe" to the services, he did not suffer discrimination and therefore lacked standing under the Unruh Act or the Gender Tax Repeal Act. (*Id*. at p. 420.)

In *Reycraft v. Lee* (2009) 177 Cal.App.4th 1211, a disabled person, who was a guest of a mobile home park tenant, sued the owners and operators of the park's swimming pool because of its lack of a lift to allow her to access the pool. (*Id*. at pp. 1215-1216.) The court of appeal reviewed the standing issues raised in *Angelucci* and *TrueBeginnings* (*id*. at pp. 1220-1221) as well as other cases, and concluded that standing under the Disabled Persons Act (Civil Code section 54.3) is established when a plaintiff "actually presented himself or herself to a business or public place with the intent of purchasing its products or utilizing its services in the manner in which those products and/or services are typically offered to the public and was actually denied equal access on a particular occasion. If, as in *Angelucci*, the business or public place does not allow admittance without a fee, a disabled plaintiff would need to show he or she presented himself or herself to the business or public place intending to patronize it and to pay the admission fee to gain admittance. . . ." (*Id*. at p. 1224.) Because the plaintiff was not

19

properly registered to use the pool as a guest or a tenant of the park, the court ruled she was not actually denied access and the trial court's ruling that plaintiff did not have standing was affirmed. (*Id*. at pp. 1227-1228.)

The question presented in *True Beginnings* and *Reycraft* of whether the plaintiff actually attempted to or actually subscribed to the services is not dispositive here, as all the plaintiffs in this case actually applied to WF for home loans and received them. The process of applying for loans was the equivalent of participation in a service offered to the public. *Angelucci* makes it clear the plaintiffs were not required to demand equal services, nor did they have to allege that after their demand, they were refused.

Here, the plaintiffs had standing to claim discrimination because they presented themselves to the bank and received a home loan. This is not a denial of service case as in *Reycraft* because they received loans. Moreover, in *Reycraft*, the plaintiff was not one of the group intended to use the pool since she was not a member of the trailer park and was not utilizing its services in the manner in which the services were offered. (*Reycraft v. Lee, supra*, 177 Cal.App.4th at pp. 1224-1225.) In this case, the class members did not include those who applied for loans from the minority branches but were turned down, or those who were offered loans, but elected not to seek financing through WF. The "service" was the granting of the loan, not the use of the Loan Economics tool. The plaintiffs received different information about the pricing of loans, but were still granted the loans. Thus, the plaintiffs actually presented themselves and did not receive equal treatment from WF and had standing to bring an Unruh Act claim.

As a corollary to the standing argument, WF argues that plaintiffs cannot establish damages under the Unruh Act unless they can show they received less favorable loan terms than those who were offered use of the Loan Economics program. WF contends that if the plaintiffs received loans at terms more favorable than that which they would have received had the LE Program been utilized, there was no damage.

We disagree. According to *Angelucci*, the injury occurred when the discriminatory policy was applied. Although *Angelucci* involved a judgment on the pleadings, it concluded that plaintiffs were injured within the meaning of the Unruh Act

20

"when they presented themselves for admission and were charged the nondiscounted price." (*Angelucci, supra*, 41 Cal.4th at p. 173.) It cited *Koire*, which interpreted the Unruh Act as "broadly condemning any business establishment's policy of gender-based price discounts" and its determination that "injury occurs when the discriminatory policy is applied to the plaintiff." (*Angelucci, supra*, 41 Cal.4th at p. 175.)

In *Botosan v. McNalley* (9th Cir. 2000) 216 F.3d 827, a disabled person attempted to patronize a real estate office but found no handicapped parking. The consumer sued the property owners and the lessee real estate company under the Americans with Disabilities Act and the Unruh Act. The Ninth Circuit upheld the district court's finding that the consumer could recover Unruh Act statutory damages without proving that it was impossible to enter the office. He only had to prove he attempted to become a customer and was deterred. The Ninth Circuit held: "[P]roof of actual damages is not a prerequisite to recovery of statutory minimum damages." (*Id.* at p. 835.)

Here, it is the application of the financial policy that is the evidence of discrimination. Plaintiffs were treated differently merely because of the geographic location of the branch they visited. It is not the type of loan they received, nor the financial impact of the failure to use Loan Economics which constituted discrimination.

WF also attempts to rely on the California Judicial Council's jury instruction regarding Unruh Act violations which required proof of harm. The instruction the jury was given was based on former CACI No. 3020 (now CACI No. 3060) which provided that plaintiffs must prove (1) WF discriminated or made a distinction that denied full and equal accommodations/advantages/facilities/privileges/services to each plaintiff; (2) that a motivating reason for WF's conduct was plaintiffs' race/color/ancestry/national origin; (3) that plaintiffs in the class they represent were harmed; and (4) that WF's conduct was a substantial factor in causing harm to the class they represent.

The Judicial Council approved revised Directions for Use to this instruction in June 2012 and again in 2013. The revised Directions for Use now provide: "Note that the jury may award a successful plaintiff up to three times actual damages but not less than $4,000 regardless of any actual damages. (Civ. Code, § 52(a).) In this regard, harm is

21

presumed, and elements 3 and 4 may be considered as established if no actual damages are sought.  [Citing *Koire, supra,* 40 Cal.3d at p. 33.]"

WF argues in its reply brief that the revised Directions for Use do not undermine its argument because the CACI instruction is not legal authority, and that the revision which was promulgated more than a year after the trial ended should not retroactively affect the class certification ruling.  In addition, WF argues that even despite the use directions, there still must be an adverse action which is causally linked to the discriminatory intent.

WF contends that a plaintiff who is not injured as a result of a defendant's actions cannot suffer.  It cites *Angelucci* and subsequent cases for the proposition that plaintiff must actually show injury from the discriminatory conduct and contends that pursuant to this "settled law" CACI lists the essential elements to an Unruh Act claim.  It argues the trial court erred by holding that the class could recover only by proving policy, and not requiring a showing of an external effect (injury) caused by the policy.

We disagree with WF's contentions.  As *Angelucci* explains, it is the application of the discriminatory policy, not the actual damages, which results in an Unruh Act injury.  (*Angelucci, supra*, 41 Cal.4th at p. 175.)

6. *Was the class properly certified?*

a. *Ascertainable Class*

Whether a class is ascertainable is determined by examining the class definition, the size of the class and whether the members may be readily identified without unreasonable expense or time.  (*Thompson v. Auto Club of Southern California* (2013) 217 Cal.App.4th 719, 728.)

Ascertainment of class members in this case is fairly simple.  The members of the class would be those who received a home loan from what would be considered a minority branch of WF.  This information was available from WF's records.  The size of this class would be large, but manageable, since the number of WF branches involved was relatively small.  Only those customers who received loans, not all those who applied for financing, were included in the class.  The inquiry of whether or not borrowers were

22

offered the Loan Economics program would not have to be resolved on an individual basis because the loan officers involved testified that at certain branches they did not offer or use the program at all.

      *b. Community of interest*

      In order to determine whether the class members have a community of interest, we look to the three factors enunciated in *Sav-On:* predominant common questions of law and fact, typicality of claims or defenses, and representatives who can adequately represent the class. (*Sav-On, supra*, 34 Cal.4th at p. 326.) Of these class members, their common interests would be defined by their treatment by WF (denial of use of Loan Economics program) based upon the fact that they were applying through a minority branch.

      (1) Predominant common questions of law or fact

      In determining whether there are predominant common questions of law or fact, we examine whether the theory of recovery advanced by the plaintiffs is likely to prove amenable to class treatment. We examine the allegations of the complaint and supporting declarations and consider whether the resolution of the legal and factual issues presented would best be resolved by class treatment. (*Brinker, supra*, 53 Cal.4th at pp. 1022-1023.)

      If liability can be determined by facts common to all members of the class, certification is in order even if the class members must individually prove their damages. (*Brinker, supra,* 53 Cal.4th at p. 1022.)

      The complaint alleged that the plaintiffs each resided in minority neighborhoods and applied for real estate loans from WF through a minority neighborhood branch. It set forth allegations regarding the use of the Loan Economics program, alleging that loan officers operating out of the minority neighborhood branches did not use the Loan Economics Program. It defined the class members as all borrowers who obtained a first trust deed-secured home loan from WF in an amount in excess of $150,000, who applied for a loan through a WF branch located in a minority neighborhood in Los Angeles and whose loan was not processed or prepared with the use of the Loan Economics Program. It listed 18 common questions of law and fact, including whether there were disparities

23

between charges, fees and/or rates imposed on minority neighborhood borrowers and non-minority neighborhood borrowers of equal credit risk and credit worthiness; whether these disparities demonstrate that WF intentionally discriminated against the plaintiffs based on race, color, ancestry, and/or national origin; whether the disparities can be explained or justified by a legitimate non-ethnic and/or non-racial factor; and whether the Loan Economics program created lower priced loans for WF customers.

Claims that a uniform policy was consistently applied to a group are proper for class treatment. (See *Lopez v. Brown* (2013) 217 Cal.App.4th 1114, 1127.)

The theory advanced by plaintiffs was that the policy was applied to those in a certain geographic area, which was in turn defined by its racial makeup. Plaintiffs alleged the policy was not individualized according to credit history, type of home to be purchased or the amount of the borrower's assets. They argued this policy violates the law because it was based on race and geography. Each of the plaintiffs asserted discrimination for the same policy and thus common questions of law and fact were present in this case.

We conclude the allegations of the complaint and the theory of recovery advanced by the plaintiffs make the case amenable to class treatment.

(2) Class representatives with typical claims or defenses

Part of the community of interest requirement is a showing that the plaintiffs' claims are typical of the class. The right of each class member to recover may not be based on a separate set of facts only applicable to that individual. (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809.) As long as every member of the alleged class would not be required to litigate numerous and substantial questions to determine his or her right to recover, class treatment is proper. (*Ibid.*)

The named plaintiffs all alleged that they applied for home loans at a minority neighborhood branch and were not given the opportunity to see or use the Loan Economics program. None of them had any unique claims which would require adjudication outside of the statutory Unruh Act violation. Plaintiffs, like all prospective class members, were subject to and affected by WF's discriminatory policy. The

24

members have the same or similar injury due to the same conduct, and the action is based on conduct which is not unique to the named plaintiffs. We conclude the named plaintiffs had claims and defenses typical of the class.

(3) Class representatives who can adequately represent the class

To maintain a class action, the representative plaintiff must adequately represent and protect the interests of other members of the class. (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 463 (*City of San Jose*).) The adequacy of class representatives is not at issue here. In any case, there were no allegations of conflicts of interest between the plaintiffs and class members, nor was there any question raised about whether plaintiffs and their counsel would prosecute the action vigorously on behalf of the class.

*c. Are there more issues which may be jointly tried than issues which require separate adjudication?*

It must be shown that substantial benefits to both the litigants and the court will result from class treatment. (*City of San Jose, supra*, 12 Cal.3d at p. 460.) Although the terms of a loan are dependent on a variety of factors, i.e., the borrower's credit history, assets, the amount of down payment, the property's value, etc., here, the single unifying factor would be the treatment of minority branch patrons and not the actual pricing of the loan. WF's denial of a program which was available to everyone else except for those borrowers from minority branches is the harm; whether plaintiffs could have received more favorable loan terms is not.

If there were no class treatment, each individual plaintiff would have to bring in the same witnesses in every case to demonstrate WF's policy and the administration of its Loan Economics program. These individual actions would be an inefficient use of court resources and could result in inconsistent damage awards. The class action procedure is therefore a superior mechanism for a fair and efficient adjudication of plaintiffs' claims.

*d. Conclusion*

The trial judge understood the facts and used the appropriate criteria for determining whether class treatment was appropriate. The court examined the theory of

25

recovery, assessed the nature of the legal and factual disputes likely to be presented and decided that common issues predominated. There was no abuse of discretion in granting the motion for class certification and later denying the two motions for decertification.

*7. Violation of WF's due process rights*

In its post-trial motion to decertify, WF contends the court erred by: (1) allowing proof by testimony about averages rather than by direct evidence of overpayment; (2) not allowing the use of its proposed verdict form; (3) using another verdict form which allowed non-claimants to recover and as a result there was no way to properly distribute the award.

WF claims its due process rights were violated by class treatment because there were non-claimants in the class (those who were not "injured" because they suffered no monetary loss) but who were included in the calculation of statutory damages of $4,000 per loan and thus their presence in the class increased the total amount of damages.

WF contends there was therefore no evidence of how many class members were injured, so the computation of the total judgment was affected. The verdict form which was given did not refer to specific loans but asked the jury to find a certain number of loans. Because the number the jury found was not tied to any branch or branch manager WF contends that no one can prove any direct harm to any particular group of borrowers.

WF admits that its verdict form would have overwhelmed the jurors in its size and detail, but argues that the size and detail of information necessary proves class treatment was inappropriate.

The cases cited by WF, *Collins v. Safeway* (1986) 87 Cal.App.3d 62 and *City of San Jose, supra,* 12 Cal.3d at page 447 are distinguishable. In *Collins, supra*, plaintiffs sought to recover from a grocery store chain for eggs contaminated by a chemical ingredient. It was not known which eggs were contaminated. The court held it was impossible to ascertain which plaintiffs were actually harmed and thus class treatment was inappropriate. (*Collins v. Safeway, supra,* 87 Cal.App.3d at p. 71.)

In *City of San Jose, supra,* 12 Cal.3d at page 447, plaintiffs sought to recover from a city for excessive noise and pollution from a municipal airport. The court found each

26

claimant in the proposed class was damaged in different ways because of the individual geography, character and use of their properties and no class could be certified. (*Id*. at p. 461.)

Here, each class member was harmed in the same manner due to the same policy of discrimination. The members of the class were determined by WF's records of borrowers. Although it was not possible to identify specifically the 880 loans which were found to have violated the Unruh Act, the jury made the finding based on the evidence of the possible class members, which was produced by WF. WF's due process claims have no merit.

*8. Distribution Plan*

After judgment was entered, plaintiffs submitted a proposed plan of distribution. The plan provided that the $3.52 million verdict would be divided evenly among the class members who come forward. Plaintiffs conceded that it would be impossible to determine which 880 class members should recover.

WF contends that because it was impossible to determine which claimants should recover, class treatment was improperly certified. However, because the distribution plan was not proposed until after the verdict was entered, it does not affect the ruling on the certification motions. (*Bell v. Farmers Insurance* (2001)115 Cal.App.4th 715, 759.)

DISPOSITION

The judgment is affirmed. Plaintiffs are to recover costs on appeal.


**WOODS, J.**


**We concur:**



**PERLUSS, P. J.**                              **ZELON, J.**


27