Filed 7/28/16 (reposted to correct filed date)

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| REBECCA OSBORNE, | B262043 |
| Plaintiff and Appellant, | (Super. Ct. No. BC527112) Los Angeles County |
| v. | |
| BRUCE YASMEH et al., | |
| Defendants and Respondents. | |
| KODY MESSMER et al., | B265530 |
| Plaintiffs and Appellants, | (Super. Ct. No. BC553653) Los Angeles County |
| v. | |
| BRUCE YASMEH et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Richard L. Fruin and William F. Fahey, Judges. Reversed and remanded with directions.

Glenn A. Murphy for Plaintiffs and Appellants.

Courtney M. Coates for Defendants and Respondents.

_____

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts B. and C. in the Discussion section.

INTRODUCTION

Plaintiffs John Flowers, Rebecca Osborne, Seth Messmer, and Kody Messmer (collectively, plaintiffs) allege that they visited a hotel owned and managed by defendants Bruce Yasmeh, Alfred Yasmeh, American Property Management, and INE Capital Holdings.[1]  Flowers is paraplegic and employs the use of a service dog.  Osborne is Flowers's wife, and the Messmers are Flowers's stepsons.  Plaintiffs allege that they visited defendants' hotel, but management refused to rent them a room unless they first paid a non-refundable cleaning fee relating to the dog.  They allege that the charge for the room was $80, and the nonrefundable cleaning fee was $300.  Plaintiffs left the hotel without paying the fee or checking in as guests.

Plaintiffs sued defendants in two separate lawsuits, one brought by Osborne and one brought by Flowers and the Messmers.  In both actions, plaintiffs alleged violations of the Unruh Civil Rights Act (Civil Code, § 51[2]) and intentional infliction of emotional distress.  Defendants argued that plaintiffs' pleadings could not establish standing due to a "bright-line rule" articulated in *Surrey v. True Beginnings* (2008) 168 Cal.App.4th 414, 416 (*Surrey*), that under the Unruh Act, "a person must tender the purchase price for a business's services or products in order to have standing to sue it for alleged discriminatory practices relating thereto."  Because plaintiffs left the hotel without paying the fee, defendants argued, they did not have standing to assert an Unruh Act cause of action.  The trial court sustained defendants' demurrers without leave to amend.  Plaintiffs appealed from the judgments entered in their two separate cases.  We consolidated the cases for purposes of oral argument and decision.

While we agree with the result in *Surrey*, we find that its bright-line rule is not applicable to the facts of this case.  Section 52, which provides remedies for violations of the Unruh Act, states that any person aggrieved by conduct that violates the Unruh Act may bring a civil action.  (§ 52, subd. (c).)  When a disabled person such as Flowers

---

[1] Defendant INE Capital Holdings is not listed as a defendant in the Flowers/Messmer complaint.

[2] All further statutory references are to the Civil Code unless otherwise indicated.

alleges that he presented himself to a business establishment and was required to pay a fee relating to his disability before accessing the products or services offered, he has stated facts sufficient to establish that he is a person aggrieved as defined in section 52, subdivision (c), and he has therefore alleged facts sufficient to demonstrate standing to sue under the Unruh Act. A plaintiff is not required to pay a discriminatory fee to establish standing to sue under the Unruh Act, as long as the plaintiff alleges facts showing that he or she has directly experienced a denial of rights as defined in sections 51 and 52. In addition, when a disabled individual has standing to sue under section 52, subdivision (c), any person "associated with" that individual (§ 51.5, subd. (a)) has standing if the associated person has also directly experienced the discriminatory conduct. We therefore reverse the judgments below and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Rebecca Osborne[3] filed her complaint on November 8, 2013, alleging a violation of the Unruh Act and section 51.5.[4] Osborne alleged that in July 2013, she was "associated with a disabled person who uses an assistance animal to manage a disability," and that she was denied accommodation at defendants' hotel as a result. She alleged, "Defendants insisted the lodging offered to the general public could not be offered to Plaintiff unless a non-refundable cleaning fee deposit of $300 was paid, in addition to the regular room fee of approximately $80 normally charged to all other members of the general public, since Plaintiff was associated with and was using an assistance animal." Osborne sought injunctive relief, a $4,000 statutory penalty (§ 52, subd. (a)), and attorney fees. Osborne's case was assigned to superior court Department 15, before Judge Richard Fruin.

In July 2014, shortly before trial, defendants moved for judgment on the pleadings. Defendants argued that according to the rule articulated in *Surrey*, *supra*,

---

[3] Osborne is listed as "Becky Ozborn" in the complaint. Plaintiffs explained that the use of Osborne's nickname and the misspelling of her last name was erroneous.

[4] Section 51.5, subdivision (a) states that "[n]o business establishment of any kind whatsoever shall discriminate against . . . any person . . . because the person is associated with a person who has, or is perceived to have" a disability.

3

where a plaintiff alleges a defendant charged a discriminatory fee, the plaintiff must "tender the purchase price for a business's services or products" in order to establish standing under the Unruh Act. Because Osborne did not allege that she paid the fee and rented a hotel room, defendants argued, she did not establish standing.

Before defendants' motion was heard, plaintiffs Flowers and the Messmers filed a complaint on August 4, 2014. Like Osborne, Flowers and the Messmers alleged that they visited defendants' hotel in July 2013. They alleged that Flowers was refused a room because he was a disabled person who used a licensed service dog, and the Messmers were refused a room for being associated with Flowers. They alleged that "Defendants insisted the lodging offered to the general public could not be offered to Plaintiff unless a non-refundable cleaning fee deposit of $300 was paid, in addition to the regular room fee of approximately $80 normally charged to all other members of the general public." Flowers and the Messmers asserted a cause of action for violation of the Unruh Act and section 51.5, and a cause of action for intentional infliction of emotional distress.

When they filed their complaint, Flowers and the Messmers also filed a notice of related cases, alerting the superior court to the pending Osborne case. For reasons unclear to us, the trial court deemed the cases not related,[5] and the Flowers/Messmer case was assigned to superior court department 69 before Judge William F. Fahey.

In Osborne's case, Judge Fruin granted defendants' motion for judgment on the pleadings in August 2014. Judge Fruin held that under *Surrey*, Osborne was required to allege that she paid the fee to establish standing. The court granted Osborne leave to amend her complaint.

---

[5] "A pending civil case is related to another pending civil case . . . if the cases: (1) Involve the same parties and are based on the same or similar claims; (2) Arise from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact; (3) Involve claims against, title to, possession of, or damages to the same property; or (4) Are likely for other reasons to require substantial duplication of judicial resources if heard by different judges." (Cal. Rules of Court, rule 3.300.)

Osborne filed a first amended complaint on August 18, 2014. She added an allegation that "Plaintiff, through a family member, offered to pay the deposit, but it was refused since the hotel did not want a dog in the hotel and the hotel manager claimed the hotel had a right of refusal." She also alleged that "Defendant's managing agent was told, and clearly understood since it was obvious, that the husband of Plaintiff was disabled in a wheelchair and had with him a service dog to assist in managing his disability." Osborne also alleged that they were refused service not only because of the cleaning fee, but also because no dogs were allowed at the hotel. She alleged that defendants' managing agent "spoke loud enough so that the other guests could clearly hear and understand that Plaintiffs [sic] were being ejected, and this conduct was intentionally done to embarrass and publicly humiliate Plaintiffs and their family. . . ." She added that the "supposed requirement for a deposit was a trick and subterfuge and used by Defendants as a way of refusing a room to Plaintiff and getting her and her family to leave with the dog." Osborne alleged a cause of action for violation of the Unruh Act and section 51.5, and added a cause of action for intentional infliction of emotional distress, incorporating the allegations from the Unruh Act cause of action.

Defendants moved for summary judgment and demurred to Osborne's first amended complaint. Because the motion for summary judgment was deemed moot when the trial court sustained defendants' demurrer without leave to amend, we focus on the demurrer. In their demurrer, defendants again argued that Osborne lacked standing due to the *Surrey* rule that a plaintiff must pay the allegedly discriminatory fee to establish standing under the Unruh Act, and the expanded allegation that a family member attempted to pay the fee was insufficient to meet this requirement. Defendants also argued that the first amended complaint was a sham pleading. They argued that Osborne changed her allegations, maintaining in the amended complaint that defendants refused to provide her with a hotel room not because of the cleaning fee, as previously alleged, but simply because they did not want dogs in the hotel. Referencing Osborne's deposition testimony, discovery responses, and other documents, defendants argued that Osborne made clear that she never attempted to pay the alleged additional fee, and the amended

5

complaint therefore "directly contradicts judicial admissions made in the original complaint, deposition testimony, and prior sworn admissions." Osborne opposed the demurrer.

On December 5, 2014, Judge Fruin sustained defendants' demurrer to Osborne's amended complaint without leave to amend. The court held that Osborne's new allegations did not cure the defect in the original complaint, because *Surrey* requires a plaintiff to pay the discriminatory fee to establish standing. The court considered Osborne's previous complaint and statements in her deposition that the family was refused accommodation at the hotel because of the cleaning fee, and contrasted these allegations with her allegations in the first amended complaint that the hotel simply did not want dogs in the hotel. The court also held that because Osborne's allegations and statements in discovery focused on the fee rather than an outright refusal to allow dogs, the new factual allegations in the first amended complaint were "clearly sham pleading." The court did not address Osborne's cause of action for intentional infliction of emotional distress.

A week later, on December 12, 2014, defendants demurred to the Flowers/Messmer complaint.[6] Defendants argued that plaintiffs did not have standing under the Unruh Act pursuant to *Surrey*. In addition, defendants requested judicial notice of court documents and evidence from the Osborne case and other cases filed by plaintiffs' counsel, and argued that the doctrine of res judicata barred plaintiffs from asserting their claims against defendants. Defendants also argued that the cause of action for intentional infliction of emotional distress was derivative of the Unruh Act cause of action, and therefore was meritless. Flowers and the Messmers opposed the demurrer and request for judicial notice, arguing that payment of the fee was irrelevant because this was not a discriminatory pricing case, and the trial court's order in Osborne was not precedential. Judge Fahey sustained the demurrer, stating only, "The demurrer is well-

---

[6] There is no explanation in the record for the unconventional timing of the demurrer, and plaintiffs did not argue that the demurrer was untimely. (Code Civ. Proc., § 430.40, subd. (a).)

6

taken and sustained.  Because neither the opposition nor counsel at the hearing proffered new facts to overcome the demurrer, leave to amend is not granted."  The order did not state whether the court took judicial notice of the documents submitted by defendants.

Judgment was entered following each demurrer order.  Plaintiffs timely appealed each judgment.  On our own motion, we consolidated the cases for purposes of oral argument and decision.

## STANDARD OF REVIEW

"We independently review the sustaining of a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense."  (*Valbuena v. Ocwen Loan Servicing, LLC* (2015) 237 Cal.App.4th 1267, 1271.)  "'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.  [Citation.]  We also consider matters which may be judicially noticed.'  (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591, [96 Cal.Rptr. 601, 487 P.2d 1241].)"  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  Where a plaintiff has standing to bring the action, and each count in the complaint sufficiently states a cause of action, a general demurrer should be overruled.  (*TracFone Wireless, Inc. v. County of Los Angeles* (2008) 163 Cal.App.4th 1359, 1368.)

"As a general principle, standing to invoke the judicial process requires an actual justiciable controversy as to which the complainant has a real interest in the ultimate adjudication because he or she has either suffered or is about to suffer an injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented to the adjudicator."  (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 314-315.)  "The prerequisites for standing to assert statutorily based causes of action are determined from the statutory language, as well as the underlying legislative intent and the purpose of the statute."  (*Boorstein v. CBS Interactive, Inc.* (2013) 222 Cal.App.4th 456, 466.)

## DISCUSSION

### A. Plaintiffs have established standing under the Unruh Act in both actions

The Unruh Act states, "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).)

In California, "[t]wo overlapping laws, the Unruh Civil Rights Act (§ 51) and the Disabled Persons Act (§§ 54-55.3), are the principal sources of state disability access protection." (*Jankey v. Lee* (2012) 55 Cal.4th 1038, 1044 (*Jankey*).)[7] "The Unruh Civil Rights Act broadly outlaws arbitrary discrimination in public accommodations and includes disability as one among many prohibited bases. (§ 51, subd. (b).) As part of the 1992 reformation of state disability law, the Legislature amended the Unruh Civil Rights Act to incorporate by reference the ADA [the Americans with Disabilities Act of 1990], making violations of the ADA per se violations of the Unruh Civil Rights Act. (§ 51, subd. (f); *Munson v. Del Taco, Inc.*, *supra*, 46 Cal.4th at pp. 668-669.) This amendment was intended to extend to disabled individuals aggrieved by an ADA violation the full panoply of Unruh Civil Rights Act remedies. (*Munson*, at p. 673.) These include injunctive relief, actual damages (and in some cases as much as treble damages), and a minimum statutory award of $4,000 per violation. (§ 52, subds. (a), (c)(3); *Turner v. Association of American Medical Colleges* (2011) 193 Cal.App.4th 1047, 1058, [123 Cal.Rptr.3d 395].)" (*Jankey*, *supra*, 55 Cal.4th at p. 1044.) "The Act is to be given a liberal construction with a view to effectuating its purposes." (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28 (*Koire*).)

---

[7] "Part 2.5 of division 1 of the Civil Code, currently consisting of sections 54 to 55.3, is commonly referred to as the 'Disabled Persons Act,' although it has no official title." (*Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 674 fn. 8 (*Munson*).)

8

Section 51.5, while not technically part of the Unruh Act (*Semler v. General Elec. Capital Corp.* (2011) 196 Cal.App.4th 1380, 1404), provides similar protections to those "associated with" persons described in the Unruh Act: "No business establishment of any kind whatsoever shall discriminate against . . . any person . . . because the person is associated with a person who has, or is perceived to have" a disability. (§ 51.5, subd. (a).)

Standing under the Unruh Act is broad. When "any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights described in this section . . . any person aggrieved by the conduct may bring a civil action . . . ." (§ 52, subd. (c).) As the Supreme Court stated, "[A]n individual plaintiff has standing under the [Unruh] Act if he or she has been the victim of the defendant's discriminatory act." (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 175 (*Angelucci*).) "The prerequisites for standing to assert statutorily-based causes of action are to be determined from the statutory language, as well as the underlying legislative intent and the purpose of the statute." (*Surrey, supra,* 168 Cal.App.4th at pp. 417-418.) "The focus of the standing inquiry is on the plaintiff, not on the issues he or she seeks to have determined; he or she must have a special interest that is greater than the interest of the public at large and that is concrete and actual rather than conjectural or hypothetical." (*Id.* at p. 418.)

The parties discuss the two principal cases that address standing under the Unruh Act, *Angelucci* and *Surrey*. The Supreme Court in *Angelucci* primarily focused on what constituted discrimination under the Unruh Act. In that case, male plaintiffs alleged they visited a nightclub on several occasions and were charged admission fees higher than the fees charged to women. (*Angelucci*, *supra*, 41 Cal.4th at p. 165.) The defendant argued that because the plaintiffs never asked to be charged the same rates as women, they could not recover under the Unruh Act. (*Ibid.*) The Supreme Court held that a plaintiff instituting an Unruh Act lawsuit was not required to establish as a condition "that the defendant[s] have been given notice and an opportunity to correct the asserted violation." (*Id.* at p. 168.) The court also briefly touched on standing in the opinion, stating, "According to their allegations, each of the plaintiffs was subjected to, and paid,

9

defendant's gender-based price differential. Accepting plaintiffs' factual allegations as true, as we are required to do in reviewing a judgment entered on the pleadings, plaintiffs must be considered 'person[s] denied the rights provided in Section 51.' (§ 52(a).)" (*Id.* at pp. 175-176.)

The Court of Appeal expanded on *Angelucci* in *Surrey, supra,* 168 Cal.App.4th 414. In that case, the plaintiff visited a matchmaking website with the intent of using its services. (*Id.* at p. 416.) When he discovered that the website charged men for certain services that were offered to women without charge, the plaintiff chose not to subscribe. He sued the defendant alleging violations of the Unruh Act. (*Ibid.*) The trial court granted summary judgment and the Court of Appeal affirmed, because the plaintiff never subscribed to the website's services and therefore never personally experienced any discrimination. (*Id.* at pp. 418-419.) The court "adopt[ed] a bright-line rule that a person must tender the purchase price for a business's services or products in order to have standing to sue it for alleged discriminatory practices relating thereto." (*Surrey, supra* at p. 416.) The reasoning in the *Surrey* opinion is discussed more fully below.

Defendants argue that under *Angelucci* and the bright-line rule articulated in *Surrey*, plaintiffs did not establish standing under the Unruh Act: "Plaintiffs lack standing to sue because they do not and cannot allege that they actually paid the alleged discriminatory fee for the Defendants' hotel room and registered as [ ] guest[s]." We think this argument takes *Surrey*'s bright-line rule too far and contradicts California's established antidiscrimination case law.

California has long barred discrimination based on physical characteristics. Early common law decisions created a duty to serve all customers on reasonable terms without discrimination. (See *In re Cox* (1970) 3 Cal.3d 205, 212 (*Cox*).) "The California Legislature, in 1897, enacted these common law doctrines into the statutory predecessor of the present Unruh Civil Rights Act [also codified as Civil Code section 51]. (See Klein, The California Equal Rights Statutes in Practice (1958) 10 Stan.L.Rev. 253, 255-258.) The 1897 act provided: 'That all citizens within the jurisdiction of this State shall be entitled to the full and equal accommodations, advantages, facilities, privileges of

inns, restaurants, hotels, eating-houses, barber-shops, bath-houses, theaters, skating-rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens.' (Stats. 1897, ch. 108, p. 137, § 1.) A 1919 amendment broadened the act to encompass public conveyances. (Stats. 1919, ch. 210, p. 309, § 1.) In 1923 the Legislature extended the act's coverage to 'places where ice cream or soft drinks of any kind are sold for consumption on the premises.' (Stats. 1923, ch. 235, p. 485, § 1.)" (*Cox*, *supra*, 3 Cal.3d at p. 213.) Section 52 provided that anyone who denied the rights provided in section 51 was liable for damages. (*Id*. at p. 214, fn. 6.)

The application of section 51 has not historically turned on whether a plaintiff has paid a fee, or, as *Surrey* stated, "tender[ed] the purchase price for a business's services or products." In *Hutson v. Owl Drug Co*. (1926) 79 Cal.App. 390, for example, the plaintiff, "'an American citizen and a negro,'" went into the defendant's business and sat at the soda fountain. An employee, Mr. Tucker, took her order; another employee served the order, but placed it "amongst dirty dishes on the counter." (*Ibid*.) Tucker then said loudly, "'What did you serve the nigger for? I wouldn't have served her; she could have set there until tomorrow.'" (*Ibid*.) Tucker hit the plaintiff on the face and threw a cup of coffee at her chest. The plaintiff sued under section 51, and was awarded damages of $500. The Court of Appeal affirmed, stating, "[T]he damages allowed were allowed as damages sustained because respondent was not accorded the same accommodations, advantages, facilities and privileges, applicable alike to persons of the white race." (*Id*. at p. 393.) There was no discussion about whether the plaintiff paid for her order before Tucker attacked her, and there is no indication that the plaintiff's standing to assert a cause of action depended on whether she paid defendant for her meal at the time the discrimination occurred.

In *Evans v. Fong Poy* (1941) 42 Cal.App.2d 320, a couple went into a café and ordered drinks and sandwiches, but they were refused service. (*Id*. at 321.) "The testimony introduced by plaintiffs showed that they were told by the bartender and the floor manager that they could not be served at the bar because they were colored people."

11

(*Id*. at p. 321.)  The Court of Appeal affirmed the judgment in favor of the plaintiffs, and held that the action properly fell under sections 51 and 52.  (*Id*. at p. 321.)  The fact that plaintiffs were refused service suggests that their standing to assert a violation of section 51 did not turn on whether they purchased a meal or otherwise paid for the defendant's products or services.

In *Stone v. Board of Directors* (1941) 47 Cal.App.2d 749, the petitioners, who were "members of the Negro race, citizens, residents and qualified electors of the city of Pasadena," sought a writ of mandamus under section 51 to require various managing bodies to admit them to the "municipal bath houses and swimming pool, commonly known as Brookside Park Plunge."  (*Id*. at p. 750.)  The pool was available to petitioners only at limited times, and petitioners argued that "their exclusion on account of their race and color from the municipal plunge in Brookside Park at all times when it is open to the public, except on one day of each week, sufficiently alleges a cause of action."  (*Id*. at p. 751.)  The Court of Appeal agreed that "the acts here complained of are expressly enjoined by the provisions of section 51 of the Civil Code."  (*Id*. at p. 752.)  While the court noted that "certain controverted issues" remained to be determined by the trial court, there was no indication that the petitioners were required to pay the entrance fee at the Brookside Park Plunge before establishing standing to assert their rights under section 51.

In 1951, the Supreme Court considered a case involving the revocation of the plaintiff's restaurant liquor license, where the State Board of Equalization "found that plaintiff 'kept and permitted his licensed premises to be used as a disorderly house in that . . . persons of known homosexual tendencies patronized said premises and used said premises as a meeting place."  (*Stoumen v. Reilly* (1951) 37 Cal.2d 713, 715.)  The Supreme Court held that use of the premises as a meeting place for legal activity was not a valid basis for revoking a liquor license, and noted that under the Unruh Act, the plaintiff would be barred from discriminating against such patrons:  "Members of the public of lawful age have a right to patronize a public restaurant and bar so long as they are acting properly and are not committing illegal or immoral acts; the proprietor has no

12

right to exclude or eject a patron 'except for good cause,' and if he does so without good cause he is liable in damages. See Civ.Code, ss 51, 52." (*Id.*, at p. 716.) The Supreme Court later noted, "[I]n *Stoumen* . . . this court clearly established that the Civil Rights Act prohibited all arbitrary discrimination in public accommodations" (*In re Cox*, *supra*, 3 Cal.3d at p. 214), suggesting that historically the statute has been applied broadly.

In the 1950s, a string of cases held that certain businesses, such as a cemetery, a dentist's office, and a private school, were not "places of public accommodation or amusement," and therefore were not subject to the provisions of sections 51 and 52. (See, e.g., *Long v. Mountain View Cemetery Asso.* (1955) 130 Cal.App.2d 328 [cemetery]; *Coleman v. Middlestaff* (1957) 147 Cal.App.2d Supp. 833 [dentist's office]; *Reed v. Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887 [private school].) Sections 51 and 52 were therefore expanded in 1959 to become the modern Unruh Civil Rights Act, which prohibited discrimination on the basis of race, color, religion, ancestry, or national origin. (See Horowitz, *The 1959 Equal Rights in Business Establishments Statute – A Problem in Statutory Application* (1960) 33 So.Cal. L.Rev. 260, 265.)

Following the change in the law, the Supreme Court decided *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, in which the plaintiffs alleged that the "[d]efendants maintained a policy and practice of refusing to sell housing in the tract to Negroes and, because of plaintiffs' race and color, defendants refused to sell any house in the tract to plaintiffs upon conditions offered to non-Negroes." (*Id.* at p. 468.) The Supreme Court held that the plaintiffs had stated a cause of action under the Unruh Act, and offered no suggestion that the plaintiffs were required to purchase a house at a higher price or otherwise show monetary damages in order to establish standing. (*Id.* at p. 471.) The same day, the Supreme Court also held that a demurrer was improperly sustained where a "plaintiff requested defendants to procure possession of the premises for him upon the offered terms, and defendants refused to rent to plaintiff solely because of his race." (*Lee v. O'Hara* (1962) 57 Cal.2d 476, 477.) The Court said, "A broker who, in disregard of his agreement with the owner to rent to any member of the public, refuses to

13

rent to a particular prospective tenant is obviously denying services to that person." (*Id.* at p. 478.) The Court did not suggest that the plaintiffs were required to show monetary harm to establish damages.

In the habeas corpus proceeding *In re Cox*, *supra*, the petitioner stopped in a shopping center parking lot to chat with his friend, a "young man, who wore long hair and dressed in an unconventional manner." (*Cox*, *supra*, 3 Cal.3d at p. 210.) The shopping center security officer asked the men to leave. They refused, stating their intent to make a purchase, but the security officer called police and they were arrested. (*Id.* at p. 210.) The Supreme Court considered whether petitioner's ejection from the premises ran afoul of the Unruh Act. The Court held that the act was not limited to racial discrimination; "both its history and its language disclose a clear and large design to interdict all arbitrary discrimination by a business enterprise. That the act specifies particular kinds of discrimination—color, race, religion, ancestry, and national origin— serves as illustrative, rather than restrictive, indicia of the type of conduct condemned." (*Id.* at p. 212.) The Court noted that a "business establishment may, of course, promulgate reasonable department regulations that are rationally related to the services performed and the facilities provided." (*Id.* at p. 217.) However, "a business generally open to the public may not arbitrarily exclude a would-be customer from its premises and, upon the customer's refusal to leave, subject him to criminal conviction." (*Id.* at p. 216.) Although the petitioner in *Cox* made a purchase on the premises before being arrested, the Supreme Court gave no indication that his rights under the Unruh Act attached as a result of that purchase.

In 1985, the Supreme Court considered whether the Unruh Act prohibited sex-based discounts in *Koire, supra,* 40 Cal.3d 24. There, a male plaintiff visited nightclubs and car washes that offered discounts to women on certain days. Plaintiff requested the same discounts offered to women and the defendants refused. Plaintiff sued. The defendants argued "that the Unruh Act prohibits only the *exclusion* of a member of a protected class from a business establishment." (*Id.* at p. 29.) Because the plaintiff was not excluded, but charged only different prices at certain times, the defendants argued

14

that the Unruh Act did not apply. The Supreme Court rejected this argument: "The Act guarantees '*full and equal accommodations, advantages, facilities, privileges, or services . . . .*' (§ 51.) The scope of the statute clearly is not limited to exclusionary practices. The Legislature's choice of terms evidences concern not only with access to business establishments, but with equal treatment of patrons in all aspects of the business." (*Ibid*.) The Court also stated, "The Act's proscription is broad enough to include within its scope discrimination in the form of sex-based price discounts." (*Id*. at p. 30.) The Court concluded, "The express language of the Unruh Act provides a clear and objective standard by which to determine the legality of the practices at issue. The Legislature has clearly stated that business establishments must provide '*equal* . . . advantages . . . [and] privileges' to all customers 'no matter what their sex.' (§ 51.)" (*Id*. at p. 39.) The Supreme Court did not clearly state whether the plaintiff purchased car washes at higher prices or paid the higher entry fee to the nightclub. The Court gave no indication that the plaintiff's standing required a showing that he had paid the higher price.

The first case to directly examine standing under the Unruh Act appears to be *Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377 (*Midpeninsula*). In that case, Midpeninsula Citizens for Fair Housing (MCFH), "a nonprofit corporation which works to eliminate discriminatory housing practices and to secure equal housing opportunities for all people," sued the owners and managers of an apartment complex called the Westwood. (*Id*. at p. 1380.) MCFH alleged that the Westwood's one-person-per-bedroom policy violated the Unruh Act because it discriminated against families with multiple children, and it had a discriminatory impact on certain minority groups who tend to have larger families. (*Id*. at p. 1381.) MCFH argued that it had standing to sue under the Unruh Act because it was "aggrieved" after spending time and resources investigating discrimination at the Westwood: "Westwood's rental policy caused a drain on its limited resources, thus diverting needed funds from important educational and counseling services." (*Id*. at p. 1382.) The Court of Appeal noted that "the state Legislature has specifically conferred standing to sue under the Unruh Act upon the victims of the discriminatory practices and certain designated others,

i.e., district or city attorneys or the Attorney General. [Citations.]" (*Id.* at p. 1386.) The court concluded, "[W]e reject MCFH's contention that the Legislature intended, by adding the language 'a person aggrieved by the pattern or practice,' to confer standing upon an expanded class of plaintiffs whose civil rights had not been personally violated." (*Id.* at p. 1384.)

In 2007 the Supreme Court discussed the *Koire* holding in *Angelucci*, discussed above. In *Koire* the plaintiff specifically requested, and was denied, the sex-based discounted prices. In *Angelucci*, the male nightclub patrons did not establish that they had requested that the women's discounted nightclub prices be extended to them. The Court clarified that the plaintiffs were not required to demand lower admission fees and be refused in order to establish an Unruh Act violation: "[T]he Act does not contain express language requiring that before a legal action may be filed, the victim of the asserted discrimination must have demanded equal treatment and have been refused. Unlike some other remedy statutes, the Act, and specifically section 52(a), does not establish as a condition of instituting a lawsuit that the defendant have been given notice and an opportunity to correct the asserted violation." (*Angelucci*, *supra*, 41 Cal.4th at p. 168.)

The Court of Appeal relied on *Angelucci* in *Surrey*, also discussed above. The plaintiff in *Surrey* alleged that sex-based discounts for an online dating service were discriminatory. The court noted that the plaintiff's request for injunctive relief was moot because the discount program had already terminated. (*Surrey*, *supra*, 168 Cal.App.4th at p. 417.) In determining the plaintiff's standing for his remaining claims, the court noted, "The focus of the standing inquiry is on the plaintiff, not on the issues he or she seeks to have determined; he or she must have a special interest that is greater than the interest of the public at large and that is concrete and actual rather than conjectural or hypothetical." (*Id.* at p. 417.) The court said, "The mere fact that Surrey became aware TrueBeginnings was offering a discount policy for women subscribers at the time he accessed its [w]ebsite did not constitute a denial of his anti-discrimination rights under those statutes." (*Id.* at p. 418.) The court specifically considered the holding in *Angelucci*:

"[T]he California Supreme Court's acknowledgement in *Angelucci* that "'a plaintiff cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct'" is fatal to Surrey's position here. (*Angelucci, supra*, 41 Cal.4th at pp. 165, 175.) Because he did not attempt to or actually subscribe to TrueBeginnings' services, Surrey did not suffer discrimination in any sense other than 'in the abstract.' Thus, in accordance with *Angelucci* itself, he lacks standing to seek relief (whether damages or injunctive relief) for violations of the Unruh Act." (*Id*. at p. 420.)

We agree with the reasoning in *Surrey* and *Midpeninsula* that a plaintiff who only learns about the defendant's allegedly discriminatory conduct, but has not personally experienced it, cannot establish standing. Neither MCFH in *Midpeninsula* nor the plaintiff in *Surrey* experienced the denial of full and equal treatment by the defendants in those cases. Moreover, because the discount program in *Surrey* already had terminated, the plaintiff was not in a position to seek injunctive relief.

We do, however, find that the articulated bright-line rule in *Surrey* is not appropriate on the facts before us. *Surrey* stated that "a person must tender the purchase price for a business's services or products in order to have standing to sue it for alleged discriminatory practices relating thereto." (*Surrey, supra*, 168 Cal.App.4th at p. 416.) Neither the language of the Unruh Act nor its history support application of this bright-line rule here. The history of the Unruh Act and the cases interpreting it make clear that when a person presents himself or herself to a business establishment, and is personally discriminated against based on one of the characteristics articulated in section 51, he or she has suffered a discriminatory act and therefore has standing under the Unruh Act. And when such discrimination occurs, a person has standing under section 51.5 if he or she is "associated with" the disabled person and has also personally experienced the discrimination.

This holding comports with the history and intention of the Unruh Act. The cases discussing discrimination under sections 51 and 52 do not focus on whether patrons who were personally discriminated against have alleged or proved that they paid a fee or were subject to unfair pricing before bringing a lawsuit. Indeed, much of the legal history

17

surrounding sections 51 and 52 involve plaintiffs who—like Flowers and his family—were refused services, thereby making a purchase impossible. To hold that plaintiffs here lacked standing would contradict both the language and the intent of the Unruh Act.

Moreover, this case involves accommodation for a disability. As we noted last year in a case also involving Flowers, "denying a disabled person access to a public accommodation due to that person's service dog constitutes a potential violation of the ADA."[8] (*Flowers v. Prasad* (2015) 238 Cal.App.4th 930, 937.) "In 1992 . . . the Legislature amended section 51 to, among other changes, add the paragraph that became subdivision (f), specifying that '[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101–336) shall also constitute a violation of this section.' (Stats.1992, ch. 913, § 3, p. 4284; see Stats.2000, ch. 1049, § 2 [adding subdivision designations].)" (*Munson, supra,* 46 Cal.4th at p. 668.) "The general intent of the legislation was expressed in an uncodified section: 'It is the intent of the Legislature in enacting this act to strengthen California law in areas where it is weaker than the Americans with Disabilities Act of 1990 (Public Law 101-336) and to retain California law when it provides more protection for individuals with disabilities than the Americans with Disabilities Act of 1990.' (Stats.1992, ch. 913, § 1, p. 4282.)" (*Id.* at p. 669.) Requiring disabled persons to pay a discriminatory fee to establish standing when they have been personally denied equal access does not comport with the legislative intent to provide broad protections for ADA violations under the Unruh Act.

---

[8] ADA regulations define a service animal as follows: "Service animal means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. . . . The work or tasks performed by a service animal must be directly related to the individual's disability." (28 C.F.R. §§ 35.104, 36.104.) ADA regulations state that "[i]ndividuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go." (28 C.F.R. § 35.136(g).) In addition, "[a] public entity shall not ask or require an individual with a disability to pay a surcharge, even if people accompanied by pets are required to pay fees, or to comply with other requirements generally not applicable to people without pets." (28 C.F.R. § 35.136(h).)

We therefore depart from *Surrey*'s bright-line rule and hold that tender of payment of a discriminatory fee is not required to establish standing under the Unruh Act where a disabled individual has personally experienced discriminatory treatment at a business establishment. Plaintiffs were therefore not required to allege that they tendered the fee relating to Flowers's service dog to establish standing under the Unruh Act and section 51.5.[9]

[The portions of this opinion that follow (parts B. and C.) are omitted from publication]

### B.      Osborne's amended complaint was not a sham pleading

In addition to challenging the trial court's ruling on the Unruh Act allegations, Osborne argues that the trial court erred by holding that her amended complaint was a sham pleading. We agree.

"Under the sham pleading doctrine, plaintiffs are precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment." (*Deveny v. Entropin, Inc*. (2006) 139 Cal.App.4th 408, 425.) "The sham pleading doctrine is not '"intended to prevent honest complainants from correcting erroneous allegations . . . or to prevent correction of ambiguous facts."' (5 Witkin, Cal. Procedure (4th ed. 1997) Amendment of Pleadings § 1122, pp. 577–578.) Instead, it is intended to enable courts '"to prevent an abuse of process."' [Citation.]" (*Id.* at p. 426.)

Osborne's original complaint was very brief and contained few facts. Osborne alleged that she was "refused and denied a room accommodation at Defendants' Hotel due to Plaintiff's association with a disabled person who uses an assistance animal." She also alleged, "Defendants insisted the lodging offered to the general public could not be

---

[9] Plaintiffs also argue that section 54.2, which is part of the Disabled Persons Act, provides standing to sue under the Unruh Act. Because we find that plaintiffs were not required to pay the fee to establish standing under the Unruh Act, we do not reach plaintiff's argument that the intersection of these two statutory schemes may also provide standing under the Unruh Act. We also do not address defendants' argument that Osborne and the Messmers do not have standing under the Disabled Persons Act, because they did not allege such a cause of action.

19

offered to Plaintiff unless a non-refundable cleaning fee deposit of $300 was paid, in addition to the regular room fee of approximately $80 normally charged to all other members of the public."

After the trial court granted defendants' motion for judgment on the pleadings and provided Osborne leave to amend, Osborne filed a first amended complaint that included additional facts. In the amended complaint, Osborne alleged, "Plaintiff was not refused a room because of her failure to pay a charge or deposit because of a service dog, but rather was refused a room by Defendants' agent . . . because the hotel claimed it had the right of refusal . . . and the ownership and management of the hotel did not want a dog in the hotel." She also alleged that "Plaintiff, through a family member, offered to pay the deposit, but it was refused since the hotel did not want a dog in the hotel and the hotel manager claimed the hotel had the right or refusal."

Defendants demurred and argued that the amended complaint was a sham pleading because it "directly contradicts the judicial admissions made in the original complaint, deposition testimony, and prior sworn admissions." Osborne opposed the demurrer, and explained that her son Kody Messmer told her that after the family left the hotel and went to a nearby restaurant, Kody returned to the hotel and offered to pay the $300 fee. Kody reported that the manager told him that the fee was not really the issue, the hotel simply did not want dogs. Osborne said Kody did not mention this to her until shortly before she filed the amended complaint.

The trial court found that Osborne's first amended complaint was a sham pleading. The court considered Osborne's original complaint, deposition testimony, and a letter she sent to the hotel, each of which focused on the $300 fee. The court order stated, "In the face of this testimony, for plaintiff to now allege that defendant's [sic] refusal to rent a room had nothing to do with a $300 deposit, and instead was simply an outright refusal to rent to persons accompanied by a dog, is clearly a sham pleading. This conclusion is further supported by the allegations of the original complaint [in which] there was no allegation of an outright refusal to rent to persons with dogs and/or service animals."

20

Osborne argues that this was erroneous because the facts alleged in the amended complaint do not contradict the facts alleged in the original complaint. She also asserts that the court mistook her Unruh Act allegation to be based on discriminatory pricing, when in fact the discriminatory treatment, not the pricing itself, was the basis for her cause of action.

Here, Osborne did not omit or change harmful allegations. Instead, she added new facts about what allegedly occurred *after* the incident described in the original complaint. Osborne's new facts may have called into question defendants' motives, because it was unclear whether defendants wanted the extra $300 cleaning fee or whether they simply were refusing to rent a room to plaintiffs because of the dog. But defendants' motives have no impact on Osborne's ability to state a cause of action. "A plaintiff who establishes a violation of the ADA . . . need not prove intentional discrimination in order to obtain damages under section 52." (*Munson*, *supra*, 46 Cal.4th at p. 665.) Moreover, the sham pleading doctrine focuses on inconsistent facts, not inconsistent legal theories. (*Dubin v. Robert Newhall Chesebrough Trust* (2002) 96 Cal.App.4th 465, 477 ["A plaintiff is permitted to plead alternative inconsistent theories."].) Even if Osborne had asserted a discriminatory pricing theory in her original complaint and changed her theory to a more traditional disability discrimination claim in her amended complaint, that would not be a proper basis upon which to sustain a demurrer. A demurrer must be overruled where "the plaintiff has stated a cause of action under any possible legal theory." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

Under the sham pleading doctrine, "any inconsistencies with prior pleadings must be explained; if the pleader fails to do so, the court may disregard the inconsistent allegations." (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946.) In her opposition to the demurrer, Osborne explained how she came to discover the new facts alleged in her amended complaint. If defendants found the explanation implausible, they were free to explore the newly alleged facts in discovery. But implausibility is not a basis upon which to determine that an amended pleading is a sham. "It is not the ordinary function of a demurrer to test the truth of the plaintiff's

21

allegations or the accuracy with which he [or she] describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading." (*Committee on Children's Television, Inc. v. General Foods Corp*. (1983) 35 Cal.3d 197, 213.) "[T]he facts alleged in the pleading are deemed to be true, however improbable they may be." (*Del E. Webb Corp. v. Structural Materials Co*. (1981) 123 Cal.App.3d 593, 604.)

Osborne's addition of facts describing events that occurred after the incident alleged in her original complaint therefore did not render her first amended complaint a sham pleading, and the trial court erred by sustaining the demurrer on this basis.

C. **The judgments as to plaintiffs' intentional infliction of emotional distress causes of action must be reversed**

Plaintiffs also argue that they adequately alleged causes of action for intentional infliction of emotional distress based on the facts in the complaint and the required elements for this cause of action. However, defendants did not demur on the basis that plaintiffs' complaints failed to adequately allege causes of action for intentional infliction of emotional distress. In their notice of demurrer to Osborne's amended complaint, defendants asserted only that the amended complaint was a sham pleading. In the notice of demurrer to the Flowers/Messmer complaint, defendants asserted only that the emotional distress cause of action was "derivative" of the Unruh Act cause of action, and "is likewise properly dismissed." Neither trial court order considered whether plaintiffs' intentional infliction of emotional distress causes of action sufficiently alleged facts to state a cause of action. We decline to consider this issue on appeal in the first instance.

22

[The remainder of this opinion is to be published]

**DISPOSITION**

The trial court judgments are reversed and the matters are remanded with directions to vacate the orders sustaining the demurrers and enter new orders overruling the demurrers.  Appellants shall recover their costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

23